UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

JASON LATIMORE,
        Plaintiff,


        v.                                CIVIL ACTION NO.
                                          14-13378-MBB


SHERIFF STEVEN TOMPKINS, KENNETH TROTMAN,
RYAN DORGAN, ROSEANNE BARROWS, RICHARD
LIBBY, PAULA SULLIVAN, and DANIEL ALLEN,
        Defendants.

                **MEMORANDUM AND ORDER RE:**
          **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
                    **(DOCKET ENTRY # 242)**

                    **December 3, 2021**


**BOWLER, U.S.M.J.**

        Pending before this court is a motion for summary judgment

filed by defendants Kenneth Trotman ("Trotman"), Ryan Dorgan

("Dorgan"), Roseanne Barrows ("Barrows"), Richard Libby

("Libby"), Paula Sullivan ("Sullivan"), and Daniel Allen

("Allen") (collectively "defendants").  (Docket Entry # 242).

Plaintiff Jason Latimore ("plaintiff") opposes the motion.

(Docket Entry # 252).

                    PROCEDURAL BACKGROUND

        In August 2014, plaintiff filed a pro se complaint against

the Suffolk County House of Correction ("SCHOC") and two John

Doe Correctional Officers.[1]  (Docket Entry # 1).  SCHOC moved to dismiss the complaint under Fed R. Civ. P. 12(b)(6) ("Rule 12(b)(6)") (Docket Entry # 9), which this court allowed (Docket Entry # 24) on December 1, 2015.[2]  Docketed one day after the dismissal but filed prior to the dismissal under the mailbox rule, plaintiff moved to amend the original complaint and filed a proposed amended complaint.  (Docket Entry ## 25, 25-1).  On January 8, 2016, this court allowed the motion to amend and explicitly advised plaintiff that, "An amended complaint supersedes an original complaint, Brait Builders Corp. v. Mass., Div. of Cap. Asset Mgt., 644 F.3d 5, 9 (1st Cir. 2011), and the defendants in this action are therefore only Kenneth Trotman and Ryan Dorgan."  On March 3, 2016, this court ordered (Docket Entry # 35) the clerk to issue summonses to the defendants named in the amended complaint (Trotman and Dorgan) (Docket Entry # 37), and they both waived service (Docket Entry ## 42, 43).  At an October 25, 2016 hearing, this court allowed plaintiff leave to file an amended complaint on or before November 15, 2016, as "the operative complaint."  (Docket Entry # 92).  Plaintiff

---

[1]  As indicated in an October 8, 2015 Order, SCHOC identified the two "John Doe" Correctional Officers as Trotman and Dorgan in a September 16, 2015 response (Docket Entry # 17) to plaintiff's motion to compel (Docket Entry # 14).
[2]  Previously, plaintiff and SCHOC consented to proceed before this court.  (Docket Entry ## 7, 15).

filed the operative complaint on November 15, 2016.  (Docket Entry # 100).

As set out in a subsequent Memorandum and Order (Docket Entry # 157, pp. 2-3),[3] this operative complaint sets out the following claims:  (1) conversion against Trotman, Dorgan, and Barrows ("Count I"); (2) violations of the First Amendment under 42 U.S.C. § 1983 ("section 1983") against Trotman and Dorgan ("Count II"); (3) a section 1983 deprivation of counsel in violation of the Sixth Amendment against Trotman and Dorgan ("Count III"); (4) a section 1983 deprivation of due process in violation of the Fourteenth Amendment against Trotman, Dorgan, and Barrows ("Count IV"); (5) violations of the Massachusetts Civil Rights Act, section 11I of Massachusetts General Laws chapter 12 ("MCRA"), against Trotman, Dorgan, and Barrows for a May 29, 2014 incident and Trotman for an August 7, 2014 incident ("Count V") (Docket Entry # 100, ¶¶ 68-73) (Docket Entry # 157, pp. 2, 12-15); (6) intentional infliction of emotional distress ("IIED") against Trotman, Dorgan, and Barrows ("Count VI"); (7) a section 1983 claim of improper supervision resulting in the destruction of legal materials in violation of the Fourteenth Amendment against Barrows ("Count VII"); (8) a failure to train, supervise, and discipline as well as fostering a hostile work

---

[3]  Page numbers refer to the page number in the upper righthand corner of the docketed filing.

environment resulting in violations of the Eighth and Fourteenth Amendments against defendant Sheriff Steven Tompkins ("Tompkins") ("Count VIII"); and (9) section 1983 claims of breaches of equal protection and substantive due process under the Fourteenth Amendment and cruel and unusual punishment under the Eighth Amendment against Trotman, Dorgan, and Barrows, and, as to Tompkins, the Eighth Amendment ("Count IX").  (Docket Entry # 100) (Docket Entry # 157, pp. 2-3).

On December 23, 2016, Trotman, Dorgan, Barrows, and Tompkins filed a Rule 12(b)(6) motion to dismiss all claims made against them in their official capacity.  (Docket Entry # 105). In an opposition to the motion to dismiss, plaintiff conceded that such claims should be dismissed.  (Docket Entry # 108, p. 2).  Trotman, Dorgan, and Barrows further moved to dismiss Count V alleging the MCRA violations, Count VI setting out the IIED claim, and Count IX with respect to the alleged equal protection violation.  (Docket Entry ## 105, 106).  Tompkins sought to dismiss "all counts" asserted against him, i.e., Counts VIII and IX, because he did not participate in the underlying incidents and *respondeat superior* does not apply to section 1983 claims. (Docket Entry # 106).

On August 23, 2017, this court allowed in part and denied
in part the motion (Docket Entry # 105) to dismiss.[4]  (Docket
Entry # 157).  In particular, this court dismissed all claims
against Trotman, Dorgan, Barrows, and Tompkins in their official
capacities; Count V (the MCRA claim) against Barrows and Dorgan;
Count V against Trotman as it relates to the May 29, 2014
incident against Trotman;[5] Count VI (the IIED claim) as it
relates to the August 7, 2014 incident; Count XIII against
Tompkins; the equal protection claims in Count IX; and the
Eighth Amendment claim in Count IX against Tompkins.  (Docket
Entry # 157, p. 28).

The Memorandum and Order on the motion to dismiss
comprehensively sets out the factual allegations in the
operative complaint.  (Docket Entry # 157, pp. 5-11).  The
operative complaint depicts the events regarding the May 29,
2014 incident, which resulted in missing or destroyed legal
materials and personal property, and the related grievances.
(Docket Entry # 100).  It also describes the August 7, 2014
incident and the missing or destroyed additional legal
materials.  (Docket Entry # 100).

---

[4]  The conclusion includes a scrivener's error referencing Docket
Entry # "28" as opposed to "105."
[5]  At this juncture, therefore, Count V only survived against
Trotman based on the August 7, 2014 incident.

In October 2017, this court allowed plaintiff's motion for
leave to amend the complaint to include Sullivan and Allen and
denied the motion insofar as it sought to add other defendants
and additional causes of action.  (Docket Entry # 174).
Significantly, the Memorandum and Order rejected plaintiff's
attempt to add additional facts to the operative complaint and
characterized the May 2014 and the August 2014 incidents as "the
gravamen of the existing complaint (Docket Entry # 100)."
(Docket Entry # 174, pp. 4, 10).[6]  In no uncertain terms, the
Memorandum and Order also instructed plaintiff to file a

---

[6]  In opposing summary judgment, plaintiff asserts "[t]here are
numerous incidents which are the subject of this lawsuit and
these incidents['] relevance is not limited to the May 29, 2014
and August 7, 2014 incidents."  (Docket Entry # 252, p. 1).
While these incidents encompass related grievances and facts,
including but not limited to plaintiff's June 2014 discovery of
the missing or destroyed legal materials and property, the
gravamen of the governing complaint (Docket Entry ## 100, 185)
remains these two incidents.  Plaintiff's attempt to broaden the
claims beyond this is both unavailing and disingenuous.  That
said, the short statement of facts as to Sullivan and Allen
appropriately adds the related facts as to Sullivan and Allen
regarding an April 3, 2014 grievance, which led to the alleged
retaliation in violation of the First Amendment.  (Docket Entry
# 185, pp. 3-4).
    The operative complaint revolves around the May and August
2014 incidents.  (Docket Entry # 100).  The August 2017
Memorandum and Order sets out the facts regarding these two
incidents in adjudicating a Fed. R. Civ. P. 12(b)(6) motion.
(Docket Entry # 157, pp. 5-11).  Notably, this court *denied* the
motion to amend to include additional facts (except for allowing
the short statement of facts as to Sullivan and Allen) and to
include Jonathan Spinale, Zachary Clark, Sergeant Depina,
Stephanie Wright ("Wright"), Robert Martin, and Yolanda Smith as
additional defendants.  (Docket Entry # 174).

statement of facts followed by an identification of the existing

causes of action he seeks to bring against Sullivan and Allen:

> With respect to Sullivan and Allen, plaintiff shall file a
> short statement of the facts that provide the basis for
> liability against Sullivan and Allen followed by
> identifying the causes of action *in the existing complaint*
> that plaintiff seeks to bring against Sullivan and Allen.
> This is not an opportunity to add new causes of action
> against Sullivan and Allen at this late date in these
> proceedings . . . [T]his court is denying plaintiff leave
> to amend the complaint to include new causes of action
> against Sullivan and Allen.
>
> . . . Together with the existing complaint (Docket Entry #
> 100), the statement shall constitute the operative
> complaint.

(Docket Entry # 174, p. 7) (emphasis in original).[7]

On December 13, 2017, the parties filed stipulations of

dismissal for Count I against Barrows (Docket Entry # 178) and

Count V against Trotman (Docket Entry # 179).  On December 27,

2017, plaintiff filed a motion to substitute Libby for Trotman

in Count V (the MCRA claim) in light of defendants' counsel's

identification of Libby as "associated with" the August 7, 2014

incident.  (Docket Entry # 184).  In a series of rulings on May

15, 2018, this court: reiterated that the amended complaint

(Docket Entry # 100) and the short statement of facts (Docket

---

[7]  With respect to Count II, the statement plaintiff filed sets
out a First Amendment claim against Sullivan and "Allen for
retaliation" based on their "retaliatory animus" and does not
include a claim against Sullivan and Allen on the additional
First Amendment claim in Count II for freedom of speech.
(Docket Entry # 185).

Entry # 185) would comprise "the operative complaint in this case";[8] allowed the motion to substitute Libby for Trotman in the MCRA claim (Docket Entry # 184);[9] and permitted a limited reopening of discovery in relation to Libby.

In light of the foregoing, the claims in the governing complaint against defendants are:  (1) the conversion of property claim against Trotman, Dorgan, and Sullivan (Count I); (2) section 1983 First Amendment retaliation claims against Trotman, Dorgan, Sullivan, and Allen, and a section 1983 First Amendment free speech claim against Trotman and Dorgan (Count II);[10] (3) a section 1983 Sixth Amendment claim for deprivation of counsel against Trotman, Dorgan, and Sullivan based on the alleged destruction of legal materials (Count III); (4) section

---

[8]  To avoid confusion, the prior operative complaint (Docket Entry # 100) together with the December 27, 2017 statement of facts and claims (Docket Entry # 185) are referred to as "the governing complaint."

[9]  The prior dismissal of the MCRA claim against Trotman based on the May 2014 incident (Docket Entry # 157) limits the MCRA claim against Libby to the August 2014 incident and related facts.

[10]  Count II in the governing complaint sets out two First Amendment claims: (1) the first for "denial of freedom of speech" by the confiscation and/or destruction of "intellectual property" consisting of "music lyrics, . . . a screenplay, . . . books," and "business plans" by Trotman and Dorgan (Docket Entry # 100, ¶¶ 31, 49, 51); and (2) the second for "retaliation for plaintiff's petition of redress of grievance" with a focus on events taking place on May 29, 2014 (Docket Entry # 100, ¶¶ 24, 49, 50) against Trotman, Dorgan, Sullivan, and Allen.  See fn. 7 supra.  Plaintiff's summary judgment arguments on the freedom of speech claim address the intellectual property items.  (Docket Entry # 252, pp. 65-66, 69).

1983 Fourteenth Amendment due process violations against
Trotman, Dorgan, and Barrows (Count IV); (5) MCRA violations
against Sullivan and Allen for the May 29, 2014 incident, and an
MCRA violation against Libby for the August 7, 2014 cell search
(Count V); (6) IIED claims against Barrows, Trotman, Dorgan,
Allen, and Sullivan based on the May 29, 2014 incident (Count
VI); (7) a section 1983 Fourteenth Amendment claim against
Barrows and Sullivan for failure to supervise the May 2014
inventory of plaintiff's property (Count VII); and (8) section
1983 Fourteenth Amendment substantive due process and Eighth
Amendment violations against Trotman, Dorgan, Barrows, Allen,
and Sullivan for "cruel and unusual punishment" based on the
alleged intentional disposal of legal materials and property
(Count IX).[11]

---

[11]  Although the claims set out in the short statement of facts
and claims as to Sullivan and Allen do not refer to Allen by
name in Counts VI and IX, and do not refer to Sullivan by name
in Count VI, the claims state these two counts as brought
against "all defendants."  (Docket Entry # 185, p. 5).  As such
and liberally construing the filing, Counts VI and IX encompass
the above-noted claims against Sullivan and Allen.  The August
2017 Memorandum and Order dismissed Count VIII against Tompkins.
(Docket Entry # 157).
     Count IX also includes a Fourteenth Amendment due process
claim based on the disposal of plaintiff's legal materials,
which impaired plaintiff's defenses in three criminal cases.
(Docket Entry # 100, ¶¶ 97-100); (Docket Entry # 157, p. 3)
(summarizing Count IX as "breaches of equal protection and due
process and acts of cruel and unusual punishment in violation of
the Eighth and Fourteenth Amendments"); (Docket Entry # 264).
Although Count IX refers to "Procedural and Substantive Due

In connection with the pending summary judgment motion, defendants filed a motion to strike plaintiff's LR. 56.1 statement of material facts.  (Docket Entry # 258).  A separate Memorandum and Order (Docket Entry # 271) addresses this motion and adjudicates what facts are stricken from the facts in the summary judgment record for purposes of this opinion.

STANDARD OF REVIEW

Summary judgment is designed "to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Tobin v. Fed. Express Corp., 775 F.3d 448, 450 (1st Cir. 2014) (internal citations omitted).  It is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material

_____

Process," the factual description of the count does not target any improper procedure.  (Docket Entry # 100, ¶¶ 96-101). Rather, it challenges the disposal of legal materials which impaired plaintiff's defenses in three criminal cases.  See Cortes-Rivera v. Dep't of Corr. and Rehab. of Commonwealth of Puerto Rico, 626 F.3d 21, 28 (1st Cir. 2010) (examining "plain language" of complaint and its structure to determine if it raised claim); see also Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 45 (1st Cir. 2011) (courts not required to make determinations on claims "merely insinuated rather than actually articulated").  As such, it raises a substantive, as opposed to a procedural, due process claim and an Eighth Amendment claim.

factual dispute in favor of either side."  Pierce v. Cotuit Fire
Dist., 741 F.3d 295, 301 (1st Cir. 2014).

　　　"An issue is 'genuine' when a rational factfinder could
resolve it [in] either direction," and a "fact is 'material'
when its (non)existence could change a case's outcome."  Mu v.
Omni Hotels Mgmt. Corp., 882 F.3d 1, 5 (1st Cir. 2018) (internal
citation omitted); accord Green Mountain Realty Corp. v.
Leonard, 750 F.3d 30, 38 (1st Cir. 2014).  Notably, "'[a]
genuine issue of material fact "must be built on a solid
foundation -- a foundation constructed from materials of
evidentiary quality."'"  Turner v. Wall, 2020 WL 5543935, at *1
(1st Cir. 2020) (quoting Perry v. Roy, 782 F.3d 73, 77-78 (1st
Cir. 2015)) (unpublished).  Where, as here, the nonmoving party
"'would bear the burden of proof at trial," he must show "'a
trier of fact could reasonably resolve that issue in [his]
favor'" by "point[ing] to materials of evidentiary quality and
such materials must frame an issue of fact that is 'more than
"merely colorable."'"  Irobe v. United States Dep't of Agric.,
890 F.3d 371, 377 (1st Cir. 2018) (internal citations omitted);
see Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020) ("nonmoving
party may 'defeat a summary judgment motion by demonstrating,
through submissions of evidentiary quality, that a trialworthy
issue persists'").

.

The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor. See Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017) (court examines "'record in the light most favorable to the nonmovant' and must make 'all reasonable inferences in that party's favor'") (internal citations omitted). "'"Conclusory allegations, improbable inferences, and unsupported speculation"'" are ignored. Id. (internal citations omitted). Where, as here, the governing complaint (Docket Entry ## 100, 185) is not verified, it does not serve as the functional equivalent of an affidavit. See Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 93 n.9 (1st Cir. 2018); Sheinkopf v. Stone, 927 F.2d 1259, 1262-63 (1st Cir. 1991).

## FACTUAL BACKGROUND

A.  Department Procedure Regarding Inmate Property and Unit Changes

"Policy S403 describes the items an inmate receives upon admission; items that may be purchased from canteen; and items permitted in one's cell" at SCHOC during the relevant time period.  (Docket Entry # 244-9, p. 1, ¶ 3) (Docket Entry # 244-10, pp. 3-4, ¶ IV(C)).  The policy allows an inmate to retain property in his cell or room that, in total, does "not exceed authorized quantities" or "an amount which can be" searched. (Docket Entry # 244-10, p. 1, ¶ I(B)(1)).  Under the same

12

policy, an inmate cannot retain an amount of property that "may present a fire" hazard in his cell or room.  (Docket Entry # 244-10, p. 1, ¶ I(B)(1)).  Materials "in excess of" the allowed amount under Policy S403 are "considered 'excess property' and/or contraband and may be subject to confiscation" or subject to storage.  (Docket Entry # 244-9, p. 1, ¶ 3) (Docket Entry # 244-10, pp. 3-4, ¶¶ IV(C)(2), V(A)(3), (6)-(7)).  Items that are considered contraband include "items prohibited by law; not issued by the facility and/or purchased through canteen; and authorized items found in excess or altered from in its [or their] original form."  (Docket Entry # 244-9, p. 1, ¶ 4) (Docket Entry # 244-10, p. 3, ¶ IV(C)).  An item considered "[n]uisance contraband includes trash, wrappers, Styrofoam items (cups/bowls), miscellaneous papers and unauthorized food items." (Docket Entry # 244-9, p. 1, ¶ 5).  Inmates can "keep written materials (that includes legal paperwork), provided the quantity does not exceed one cubic foot."  (Docket Entry # 244-9, p. 1, ¶ 6) (Docket Entry # 244-10, p. 3, ¶ IV(C)).  If the quantity does exceed one cubic foot, Inmate Legal Services ("ILS") will store the inmate's excess legal material.  (Docket Entry # 244-9, p. 1, ¶ 6) (Docket Entry # 244-10, p. 4, ¶ V(A)(6)-(7)).

When an inmate is moved to a segregation unit, "an inmate's property must be inventoried; a personal garment bag of permitted items is gathered; additional personal property is

secured and stored; and nuisance contraband is disposed of."
(Docket Entry # 244-3, p. 1, ¶ 4).  Under the process, two
designated SCHOC officers secure the inmate's property,
inventory the property, and arrange for removal of the property
from the inmate's cell.  (Docket Entry # 244-10, pp. 6-7, ¶
V(F)).  Under Policy S422, inmates assigned to segregation units
are permitted to have only "limited items" in their cells.
(Docket Entry # 244-9, pp. 1-2, ¶ 8) (Docket Entry # 244-11, p.
5, ¶ V(B)).  Property in excess of the permitted items is
"stored in the booking area until the inmate returns to a
general population or is released" from SCHOC custody.  (Docket
Entry # 244-9, p. 2, ¶ 9).

B.  May 29, 2014 Incident and Inventory of Plaintiff's Property

     Plaintiff was "incarcerated at the SCHOC from December 9,
2013 through August 8, 2014" (Docket Entry # 244-1, p. 1, ¶
2(a)) and acknowledges he was "serving a sentence at SCHOC"
(Docket Entry # 252, p. 39).  On April 3, 2014, plaintiff filed
a law library grievance regarding his status as a pro se inmate
in three pending criminal matters and the alleged lack of
availability to the SCHOC legal library while housed in
segregation.  (Docket Entry # 256, p. 1, ¶ 1) (Docket Entry #
252-1, p. 2).

     As set forth in the grievance, plaintiff stated he "grieved
this issue" previously, which SCHOC ignored.  (Docket Entry #

252-1, p. 2).  In the April 3, 2014 grievance, plaintiff
asserted that additional law library hours were needed and
constitutionally required regardless of scheduling or
institutional rules.  (Docket Entry # 252-1, p. 2).  SCHOC
allegedly failed to provide an adequate amount of available time
slots to access the law library, according to the grievance.
(Docket Entry # 252-1, p. 2).  As a result, the grievance
requested "[m]andatory daily law library [time] for people with
open cases," reinstatement of Friday law library hours, and the
hiring of "more or new staff" if needed.  (Docket Entry # 252-1,
p. 2).  SCHOC denied the grievance on the grounds that plaintiff
had access to legal mail and would "receive adequate access to
[the] law library" when he returned to the general population.
(Docket Entry # 252-1, p. 2).

A week later, on April 10, 2014, Sullivan filed a
disciplinary report against plaintiff.  (Docket Entry # 252-1,
p. 3).  In her report, Sullivan alleges that plaintiff "refused
to comply with posted unit regulations to be fully dressed when
exiting the 3-2-unit showers."  (Docket Entry # 252-1, p. 3).
Sullivan further alleges that, when she ordered plaintiff to
"step behind the curtain," he "began a brief debate, as he stood
in the dayroom in his underwear."  (Docket Entry # 252-1, p. 3).
Sullivan describes this behavior as "defiantly challeng[ing]"
her authority because "inmates are advised daily to be in full

uniform especially in the presence of female staff."   (Docket
Entry # 252-1, p. 3).   Sullivan also alleges in the disciplinary
report that plaintiff had "been warned in the past that this
disruptive behavior would not be tolerated."   (Docket Entry #
252-1, p. 3).   Plaintiff pled "not guilty" to the alleged
misconduct and, during the disciplinary hearing, testified he
had no intention of exposing himself to Sullivan and was only
switching showers when "Sullivan came rushing over yelling" at
him.   (Docket Entry # 252-1, p. 4).   As a result of the charges,
plaintiff was denied canteen privileges until April 27, 2014,
and issued a written warning.   (Docket Entry # 252-1, p. 4).

On April 23, 2014, plaintiff filed a grievance alleging
that Sullivan "verbally assaulted" him.   (Docket Entry # 252-1,
p. 7).   The grievance requests that Sullivan be "punish[ed]" for
the behavior.   (Docket Entry # 252-1, p. 7).   SCHOC denied the
grievance due to plaintiff's "disciplinary history of conflict
with staff" and the fact that no credible witness could verify
his claim.   (Docket Entry # 252-1, p. 7).

During the evening on April 23, 2014, Sullivan filed a
disciplinary report regarding plaintiff's behavior.   (Docket
Entry # 252-1, p. 5).   According to Sullivan's report, on April
23 she "observed [plaintiff] communicating with inmates in the
3-1 unit through the recreation deck door."   (Docket Entry #
252-1, p. 5).   Sullivan alleges that when she ordered plaintiff

off the deck door, plaintiff continued his conversation and "slowly and defiantly began to exit the area." (Docket Entry # 252-1, p. 5). Sullivan also asserts in the grievance that when she advised plaintiff that he would receive a disciplinary report, plaintiff "began to protest[,] gaining the attention of the inmate population by stating he was being targeted and harassed by the staff." (Docket Entry # 252-1, p. 5).

Plaintiff once again pled "not guilty" to the allegations. (Docket Entry # 252-1, p. 6). In his testimony during a disciplinary hearing, plaintiff stated that he was complying with Sullivan's orders to get off the recreation deck door and that it was Sullivan's conduct that was "causing a scene." (Docket Entry # 252-1, p. 6). Plaintiff also acknowledged saying he was "being targeted and harassed by the staff." (Docket Entry # 252-1, p. 6). Plaintiff additionally testified that Sullivan followed him back to his cell, screaming things such as "'this is my unit'" and "'I[']ll run it the way I want.'" (Docket Entry # 252-1, p. 6). Sullivan also "slammed the [cell] door," according to plaintiff's testimony. (Docket Entry # 252-1, p. 6). As a result of the charges, SCHOC imposed 48 hours of "restricted movement" on plaintiff. (Docket Entry # 252-1, p. 6).

17

On May 14, 2014, another incident took place, according to plaintiff's May 14, 2014 affidavit.[12]  (Docket Entry # 252-1, pp. 86-88).  Specifically, on May 14, plaintiff was preparing a meal for himself and his cellmate which consisted of "5 bowls of food."  (Docket Entry # 252-1, p. 86).  When it was time for plaintiff and his cellmate to collect their medicine, Sullivan came to the door to let plaintiff out of his cell.  (Docket Entry # 252-1, p. 86).  In the affidavit, plaintiff states that Sullivan had been "observing [him] prep the food for the past hour."  (Docket Entry # 252-1, p. 86).  According to plaintiff, Sullivan "observed [him] grabbing the 5 bowls to exit the cell and slammed the door in [his] face."  (Docket Entry # 252-1, p. 86).  She then "slammed the door a second time when [he] tried to get the food again" and did the same to plaintiff's cellmate when he tried to grab the food.  (Docket Entry # 252-1, p. 86).

The affidavit also states that "[a]fter a struggle and banging the door," Sullivan let plaintiff and his cellmate out for plaintiff's medication and recreation.  (Docket Entry # 252-1, p. 86).  Sullivan nevertheless ordered plaintiff to "lock in" as soon as he got his medication "for no apparent reason" and would not let him out of his cell to finish preparing his meal, according to the affidavit.  (Docket Entry # 252-1, p. 86).  As

---

[12]  In a June 3, 2014 grievance, plaintiff depicts the incident as taking place on May 7, 2014.  (Docket Entry # 252-1, p. 11).

a result, plaintiff attests he was "forced to eat a half cooked meal which [his] cellmate prepared [as plaintiff] pass[ed] the food under the door for [his cellmate] to cook." (Docket Entry # 252-1, p. 86).

Plaintiff's affidavit also references instances of mistreatment by Allen on May 25, 2014.[13] (Docket Entry # 252-1, p. 86). Plaintiff states that on May 25, while waiting in a medication line, he realized he left his identification in his "daytime shirt." (Docket Entry # 252-1, p. 86). As stated in the affidavit, plaintiff was "profusely sweating" from a basketball game he played prior to getting his medicine. (Docket Entry # 252-1, p. 86). After getting his identification from his cell, plaintiff returned to the medication line. (Docket Entry # 252-1, p. 86). As also stated in the affidavit, when he was at the front of the line, Allen ordered plaintiff to "lock in" after he received his medication and informed him he "was not coming out for the rest of the night." (Docket Entry # 252-1, p. 86). By affidavit, plaintiff states he had to shower in his sink that evening as a result. (Docket Entry # 252-1, pp. 86-87). The affidavit depicts this treatment as "a re-

---

[13] The affidavit is dated May 14, 2014, perhaps in error, and, together with a motion to preserve evidence, docketed in Massachusetts Superior Court (Suffolk County) on June 23, 2014. (Docket Entry # 252-1, pp. 65, 84-88).

occurring theme," and that Allen had locked plaintiff in his "cell 5 or 6 times in 2 months."  (Docket Entry # 252-1, p. 86).

On May 29, 2014, plaintiff "and a cellmate[] were assigned to cell 3 in the 3-2 housing unit."  (Docket Entry # 244-1, ¶ 2(b)).  That day, the following defendants held the following posts from 3:00 p.m. to 11:00 p.m.: (1) Barrows "was assigned as a Building 3 Lieutenant" (Docket Entry # 244-2, ¶¶ 1-2); (2) Sullivan was a "Sergeant assigned to the 3-2 housing unit" (Docket Entry # 244-3, p. 1, ¶ 2); (3) Allen "was assigned as a Building 3-2 unit officer" (Docket Entry # 244-4, ¶¶ 1-2); (4) Dorgan "was assigned as a unit officer in the 3-4 unit" (Docket Entry # 244-5, p. 1, ¶¶ 1-2); and (5) Trotman "was assigned as the kitchen utility officer" (Docket Entry # 244-7, p. 1, ¶¶ 1-2).

On May 29, 2014, an inmate, referred to as "MC," in cell 20 in the 3-2 housing unit was escorted out of the unit due to disciplinary infractions and removed to segregation.  (Docket Entry # 244-3, p. 1, ¶ 3) (Docket Entry # 244-4, ¶ 3).  Allen collected "MC's property . . . and placed [it] by the . . . control panel for inventory."  (Docket Entry # 244-3, p. 1, ¶ 5) (Docket Entry # 244-4, ¶ 3).  On the same day, plaintiff was also escorted out of the 3-2 unit because of disciplinary infractions (Docket Entry # 244-4, ¶ 4) (Docket Entry # 244-9, p. 1, ¶ 7) and "moved to the 1-4-2 segregation unit" (Docket

Entry # 244-1, ¶ 2(c))  (Docket Entry # 252-1, pp. 87, 91)

(Docket Entry # 244-9, p. 1, ¶ 7).[14]  (Docket Entry # 272, Ex.

13A).

        As set out in plaintiff's affidavits, on May 29 while

plaintiff was playing basketball with other inmates on the

recreation deck, a disruption in the rear of the 3-2 unit

dayroom interrupted their game.  (Docket Entry # 252-1, pp. 87,

91) (Docket Entry # 272, Ex. 13C).  Plaintiff and the other

inmates stopped their game and went to witness the disturbance

in the unit.  (Docket Entry # 252-1, pp. 87, 91).  Plaintiff

avers that he was not wearing his uniform top.  (Docket Entry #

252-1, pp. 87, 91).  He also states that "none" of the other

inmates who also left the recreation deck and entered "the unit

. . . had [their] uniform tops on," whereas video footage shows

only a few inmates not wearing a blue top.  (Docket Entry # 272,

Ex. 13A).  Allen then came to the rear of the unit, yelling at

the inmates to disperse.  (Docket Entry # 252-1, pp. 87, 91).

Plaintiff "waived 5 fingers at [Allen]" and told him to "calm

down."  (Docket Entry # 252-1, pp. 87, 91).  When the inmates

returned to their game, Allen yelled "Lock in."  (Docket Entry #

---

[14]  Policy S430 requires that "[n]o inmate shall be placed in
disciplinary segregation . . . without being afforded a hearing
by the Disciplinary Office."  (Docket Entry # 252-1, p. 8).  The
policy also prohibits "capricious or retaliatory" disciplinary
sanctions and "corporal punishment."  (Docket Entry # 252-1, p.
8).

252-1, pp. 87, 91).  When the inmates went to gather their uniforms, Allen indicated the order was directed only at plaintiff.  (Docket Entry # 252-1, pp. 87, 91).  Plaintiff attests he was complying with Allen's order and asking Allen "'why he wanted me to lock in,'" at which point Allen radioed into the guards.  (Docket Entry # 252-1, pp. 87, 91).

On May 29, 2014, plaintiff was escorted to segregation and received a disciplinary report and subsequent hearing.  (Docket Entry # 252-1, pp. 16-18, 87).  In the disciplinary report, Allen asserts that plaintiff did not comply when guards escorted him out because he told Allen that he would not leave the recreation deck.  (Docket Entry # 252-1, p. 16).  As alleged in the disciplinary report, Allen describes that plaintiff ignored subsequent orders by Allen before he radioed into a Special Emergency Response Team ("SERT") to have plaintiff removed.  (Docket Entry # 252-1, p. 16).

As indicated above, plaintiff was "escorted out of the unit to 1-4-2 segregation unit."  (Docket Entry # 252-1, pp. 87, 91) (Docket Entry # 272, Ex. 13A).  Upon being placed in segregation, plaintiff asked an unnamed guard to call Barrows and request that she "oversee or assign a CO to inventory [his] cell besides" Sullivan and Allen.  (Docket Entry # 252-1, pp. 87, 91).  Barrows assigned Dorgan to oversee the inventory.  (Docket Entry # 244-2, ¶ 2).  By the time Dorgan arrived,

22

Sullivan and Allen had already begun the process of inventorying items in plaintiff's cell.  (Docket Entry # 272, Ex. 13A). Plaintiff's cellmate in the 3-2 housing unit provided Sullivan plaintiff's property, which included a box of material or papers.  (Docket Entry # 244-3, p. 1, ¶ 6) (Docket Entry # 272, Ex. 13A).  Sullivan placed the box by a table.  (Docket Entry # 272, Ex. 13A).

Allen did not inventory plaintiff's property, instead focusing on "completing reports related to these inmates." (Docket Entry # 244-4, p. 1, ¶ 5) (Docket Entry # 272, Ex. 13A). Video reflects him writing at a table.  (Docket Entry # 272, Ex. 13A).  Sullivan is seen inventorying various items (Docket Entry # 272, Ex. 13A), and she attests she "focused on the inventory of MC's property" (Docket Entry # 244-3, p. 1, ¶ 8).  Sullivan "did not read written or legal materials," (Docket Entry # 244-3, p. 2, ¶ 10), which video footage also indicates (Docket Entry # 272, Ex. 13A).  Additionally, according to video footage,[15]

---

[15]  SCHOC cameras captured the May 29, 2014 events.  (Docket Entry # 244-14) (Docket Entry # 244-18).  The inaudible video footage from 8:00 p.m. to midnight are exhibits 13A, 13B, and 13C.  (Docket Entry # 272).  Defendants provided details of camera angles and an institutional map indicating camera placement.  (Docket Entry # 244-18).  This court accessed and fully reviewed the video evidence (Docket Entry # 272, Ex. 13A-13C) and views the facts "'in the light depicted by [this] video evidence." O'Brien v. Town of Bellingham, 943 F.3d 514, 531 (1st Cir. 2019).  An investigator assigned to the Sheriff's Investigative Division, who is familiar with an investigation by

Sullivan discarded small items into the trash.  (Docket Entry #
272, Ex. 13A) (Docket Entry # 244-3, p. 2, ¶ 10).  Due to the
camera angle and distance, the exact nature of the small items
Sullivan discarded is unclear, but there is no showing she threw
away plaintiff's legal documents or plaintiff's personal
property identified in a grievance as "yellow legal pads with
music lyrics," one "yellow pad with a screenplay" for "a movie,"
one "yellow pad with a book," and "business plans" (Docket Entry
# 252-1, p. 20).  (Docket Entry # 272, Ex. 13A).  In particular,
at 9:43 p.m., the video shows Sullivan picking up a single,
blank piece of white paper and discarding it into the trash.[16]  A
few minutes later in the video, she is seen placing manila

---

the Sheriff's Investigative Division ("SID") into plaintiff's
purported loss of property, also reviewed the video recordings,
and he describes what the video shows occurred on May 29, 2014,
in an affidavit.  (Docket Entry # 214-14).  This court relies on
this affidavit only to the extent it identifies the individuals
in the inaudible video and the property as belonging to either
plaintiff or MC, which the inaudible video does not clarify and
to the extent consistent with affidavits based on personal
knowledge.  (Docket Entry # 272, Ex. 13A).  Otherwise, the
recitation of the inventory and the transport of the inventoried
material is based primarily on the video evidence and, to the
extent confirmed or to fill in gaps, the affidavits of Sullivan,
Trotman, and Dorgan based on their personal knowledge.
Plaintiff's recitation of the events (Docket Entry # 256, ¶¶ 44-
101), to the extent not stricken from the record, is set out in
plaintiff's LR. 56.1 statement.  The unstricken paragraphs do
not change the outcome on any of the causes of action subject to
summary judgment.
[16]  Here again, the distance of the camera makes it difficult to
discern the exact nature of the document but the video does not
show the document constitutes "legal documents," as plaintiff
contends.

envelopes with legal documents into a plastic bag.[17]  Trotman is also seen helping Sullivan and putting manila envelopes into the plastic bag.[18]  (Docket Entry # 272, Ex. 13A) (Docket Entry # 256, pp. 13-14, ¶¶ 79-80) (Docket Entry # 244-15, p. 3, ¶ 5).  As additionally shown in the video, Sullivan placed various papers into the aforementioned box of plaintiff's papers and closed the lid.  (Docket Entry # 272, Ex. 13A) (Docket Entry # 244-3, p. 1, ¶¶ 6, 9).

Barrows was in the 3-2 housing unit for approximately ten or 11 minutes and left the unit without carrying anything.  (Docket Entry # 272, Ex. 13A).  She is not seen assisting in the inventory of plaintiff's property, and she was not present during the inventory of plaintiff's property.  (Docket Entry # 272, Ex. 13A) (Docket Entry # 244-2, p. 1, ¶ 3).  Rather, as indicated, Barrows asked "Dorgan and Trotman to assist in the inventory of property belonging to [plaintiff] and inmate MC."  (Docket Entry # 244-2, p. 1, ¶ 2).

In addition to Sullivan and Trotman, Dorgan participated in the inventory.  (Docket Entry # 272, Ex. 13A) (Docket Entry #

---

[17]  See the next footnote.#
[18]  Although the video does not show the contents of the manila envelopes as containing *legal* documents or the plastic bag as containing *legal* documents, the parties agree that Sullivan and Trotman deposited the manila envelopes with the legal documents into a single plastic bag and that Trotman placed the bag on the cart.  (Docket Entry # 256, pp. 13-14, ¶¶ 79-80) (Docket Entry # 244-15, p. 3, ¶ 5).

244-5, p. 1, ¶ 3).  A few minutes after Dorgan arrived, Trotman entered the unit with a laundry cart.  (Docket Entry # 272, Ex. 13A).  Shortly thereafter, the video depicts Trotman and Dorgan at one of the tables inventorying plaintiff's property.  (Docket Entry # 272, Ex. 13A) (Docket Entry # 244-5, p. 1, ¶ 3).  During the inventory, Dorgan is seen writing on a piece of paper (Docket Entry # 272, Ex. 13A), and he attests to completing an Inventory Property Sheet (Docket Entry # 244-5, p. 1, ¶ 4) (Docket Entry # 244-6).  The video does not show Trotman reading documents (Docket Entry # 272, Ex. 13A), and he attests that he "did not read [plaintiff's] written or legal materials" (Docket Entry # 244-7, p. 1, ¶ 5).  Trotman and Dorgan threw away small items in the trash, and they aver they discarded only "nuisance contraband" consisting of wastepaper items, trash, and napkins.[19] (Docket Entry # 272, Ex. 13A) (Docket Entry # 244-5, p. 1, ¶ 5) (Docket Entry # 244-7, p. 1, ¶ 5).  After Sullivan closed the lid on plaintiff's box of papers, Trotman put the bag with the

---

[19]  The video shows they threw away small items but the distance of the camera precludes a precise identification of the items. Plaintiff testified at his deposition that when looking at the video surveillance, it is generally difficult to make out the content of certain papers.  (Docket Entry # 244-15, p. 10) (Docket Entry # 244-16, pp. 3-4).

manila envelopes and the box of plaintiff's papers onto the cart.[20]  (Docket Entry # 272, Ex. 13A).

After completing the inventory of both plaintiff's and MC's property, Dorgan left the unit with two bags to deliver to plaintiff and MC, while Trotman left the unit with the laundry cart containing MC's and plaintiff's property to store the property, including the box of plaintiff's documents and the plastic bag with the manila envelopes.  (Docket Entry # 244-5, p. 1, ¶ 6) (Docket Entry # 244-7, p. 1, ¶ 7) (Docket Entry # 244-3, p. 1, ¶ 9) (Docket Entry # 272, Ex. 13A-13C).  Dorgan and Trotman exited the unit into a hallway, entered an elevator together, and rode the elevator together.  (Docket Entry # 244-5, p. 1, ¶ 6) (Docket Entry # 272, Ex. 13B).  Following the elevator ride, Trotman went to the booking area to store the property, while Dorgan went to the segregation unit housing plaintiff and MC.  (Docket Entry # 244-7, p. 1, ¶ 7) (Docket Entry # 244-5, p. 1, ¶ 6) (Docket Entry # 272, Ex. 13B, 13C).

Video shows Trotman entering the booking station area with the cart.  (Docket Entry # 272, Ex. 13C).  A few minutes later, he goes into the segregation property room with the cart.  (Docket Entry # 272, Ex. 13C).  He leaves the property room and

---

[20]  The parties agree that Trotman put the box with plaintiff's documents on the cart.  (Docket Entry # 256, p. 14, ¶ 81) (Docket Entry # 244-15, p. 3, ¶ 5).

the booking station, after depositing the cart near the
entrance, and returns to the booking area a few minutes later
and retrieves the cart, which appears empty of the box of
documents and the plastic bag.[21]  (Docket Entry # 272, Ex. 13B,
13C).

Dorgan proceeded to the segregation unit and delivered the
bag with plaintiff's property to plaintiff and the other bag to
MC.[22]  (Docket Entry # 272, Ex. 13B) (Docket Entry # 244-5, p.
1, ¶ 6).  Plaintiff's bag included some legal materials.[23]
(Docket Entry # 272, Ex. 13B) (Docket Entry # 244-5, p. 1, ¶ 6).
After delivering plaintiff his bag, Dorgan "had no [further]
contact with [plaintiff's] property."  (Docket Entry # 244-5, p.
1, ¶ 6).  By affidavit, Sullivan, Dorgan, and Trotman attest

---

[21]  At an August 3, 2017 deposition, plaintiff testified he had
no evidence that Trotman handled his property after depositing
plaintiff's belongings in storage.  (Docket Entry # 244-15, pp.
1, 12-13).
[22]  The inventory sheet prepared by Dorgan for plaintiff's
property includes "Misc: Legal/Mail."  (Docket Entry # 244-6).
[23]  By affidavit, plaintiff attests that Dorgan brought his
property to him in segregation on May 29, 2014, but that
"Legal/Mail" was "not delivered to me."  (Docket Entry # 252-1,
pp. 87, 92).  In his August 3, 2017 deposition, however,
plaintiff testified to the contrary by stating that Dorgan
brought him "legal cases" in segregation and, in answer to a
question of whether he "[had] legal materials in that plastic
trash bag," answered, "Yes, Ma'am."  (Docket Entry # 244-15, p.
5).  Where, as here, a party provides "'"clear answers to
unambiguous questions" in discovery, that party cannot "create a
conflict and resist summary judgment with an affidavit that is
clearly contradictory."'"  Escribano-Reyes v. Pro. Hepa
Certificate Corp., 817 F.3d 380, 386 (1st Cir. 2016) (citations
omitted).

they did not destroy or confiscate any of plaintiff's personal belongings or legal materials.  (Docket Entry # 244-3, p. 2, ¶ 11) (Docket Entry # 244-5, p. 1, ¶ 5) (Docket Entry # 244-7, p. 1, ¶ 6).

A June 2, 2014 disciplinary hearing summary reflects that plaintiff pled "not guilty" to the May 29 events depicted in the aforementioned May 29 disciplinary report.  (Docket Entry # 252-1, p. 18).  During the hearing, plaintiff testified that he did not ignore Allen's orders and was unaware that Allen was speaking to him during the initial lock-in call.  (Docket Entry # 252-1, p. 18).  Found guilty of certain charges, plaintiff received five days isolation, time served, and three days isolation time suspended for 30 days until July 1, 2014. (Docket Entry # 252-1, p. 18) (Docket Entry # 252-1, pp. 87, 91).

On June 2, 2014, plaintiff was released from segregation, and on June 3, 2014, "Sgt. Depina" brought plaintiff his property except for the W.B. Mason box of printed legal cases and assorted canteen items.  (Docket Entry # 252-1, pp. 87, 92) (Docket Entry # 244-15, pp. 6-7) (Docket Entry # 244-6) (Docket Entry # 244-1, ¶ 2(d)).  Plaintiff alleges that his legal work and personal property were confiscated and destroyed during the May 29, 2014 inventory.  (Docket Entry # 252-1, p. 12).  Despite submitting grievances regarding the confiscation of the W.B.

29

Mason box of printed legal cases and the assorted canteen items,
plaintiff claims he "received no response" to the grievances as
of July 16, 2014.  (Docket Entry # 252-1, p. 92).  Plaintiff's
affidavits evidence that on June 3, 2014 (Docket Entry # 244-15,
pp. 6-7) (Docket Entry # 244-6), Sergeant Depina did not deliver
the W.B. Mason box of printed legal cases to plaintiff.  (Docket
Entry # 252-1, pp. 87, 92).  Notably, the unstricken portions of
plaintiff's LR. 56.1 statement do not controvert the paragraph
in defendants' LR. 56.1 statement that Correctional Officer
Michael Misci ("Misci") delivered a box of legal materials,
which Misci describes as a paper copy box, to plaintiff in late
June 2014.[24]  (Docket Entry # 244, p. 9, ¶ 45) (citing Docket
Entry # 244-12); (Docket Entry # 244-12); (Docket Entry # 244-9,
p. 2, ¶ 10).  Rather, at best, plaintiff's LR. 56.1 statement of
disputed facts refers to Misci's delivery in stricken paragraphs
(Docket Entry # 256, pp. 8, 23, ¶¶ 36, 131), which cite a
grievance and disciplinary report, see Bennett v. Saint-Gobain
Corp., 507 F.3d 23, 28 (1st Cir. 2007), as opposed to materials
of evidentiary quality showing that Misci did not deliver the
box of missing legal materials to plaintiff.[25]  See n.60.

---

[24]  The only reasonable inference is that the paper copy box
Misci delivered was the W.B. Mason box of legal material.
[25]  Plaintiff's affidavits and deposition only reflect that when
Sergeant Depina brought plaintiff his property from booking on
June 3, 2014, upon his release, Sergeant Depina did not deliver

Separately, during the week of July 14, 2014, Corporal
Stephanie Wright ("Wright") of SCSD cleaned the segregation
property room and found "a property bag with manila envelopes
and what appears to be legal paperwork belonging to [plaintiff]"
in the segregation property room.[26]  (Docket entry # 244-13).
Previously, on or about July 1, 2014, ILS attorney Robert Martin
("Attorney Martin") checked various locations for plaintiff's
legal papers, including the segregation property room, without
success.  (Docket Entry # 252-1, p. 27).  On July 22, 2014, ILS
paralegal Renee McNeil ("Paralegal McNeil") retrieved the legal
materials from Wright and stored these excess materials in the
law library."[27]  (Docket Entry # 244-15, pp. 16-17) (Docket Entry
# 252-1, p. 32) (Docket Entry # 244-13) (Docket Entry # 244-9,
p. 2, ¶ 10) (Docket Entry # 244-22, p. 2, ¶ 9).  On the same
day, plaintiff "was notified that his legal papers were secured
in the law library."  (Docket Entry # 244-22, p. 2, ¶ 9) (Docket
Entry # 252-1, p. 32).  As stated in plaintiff's affidavits,

---

the W.B. Mason box of printed legal cases and assorted canteen
items.  (Docket Entry # 252-1, pp. 87, 92) (Docket Entry # 244-
15, pp. 6-7) (Docket Entry # 244-6).
[26]  As previously noted, Trotman entered the segregation
property room on May 29, 2014, with the cart with the bag
containing manila envelopes and video footage shows the cart
empty of the bag and the box a short time later.
[27]  This took place after plaintiff signed his affidavits and
filed a "Motion to Inform [the] Court" about the confiscation of
his "legal materials" in Massachusetts Superior Court (Suffolk
County) (Docket Entry # 252-1, pp. 89-90) (Docket Entry # 244-
24, p. 22).

plaintiff had three open cases in which he was representing himself pro se.[28]  (Docket Entry # 251-1, pp. 87, 92).

On June 3, 2014, plaintiff filed the grievance regarding Sullivan's perceived mistreatment of slamming the cell door in his face.[29]  (Docket Entry # 252-1, p. 11).  Based on the May 2014 incident, plaintiff requested in the grievance that "Sullivan be fired" and that the internal affairs department investigate.  (Docket Entry # 252-1, p. 11).  The Institutional Grievance Coordinator denied the grievance because it was "over 30 days old."  (Docket Entry # 252-1, p. 11).

On June 3, 2014, plaintiff filed a separate grievance regarding his perceived mistreatment during the May 25 incident.

---

[28]  In the affidavits, plaintiff expresses an additional conclusory and subjective belief that he is "unable to defend [himself] in any further court proceeding as a result of this destruction maliciously of my property" or "proceed with any meaningful presentation of the facts and issues of [his] case." (Docket Entry # 252-1, pp. 87, 92).  "[U]nsupported, speculative assertions," and conclusory statements in an affidavit submitted in opposition to summary judgment do not create a genuine or a material fact sufficient to warrant proceeding to trial.  Garmon v. Nat'l. R.R. Passenger Corp., 844 F.3d 307, 315 (1st Cir. 2016); see Méndez-Aponte v. Bonilla, 645 F.3d 60, 68 (1st Cir. 2011).  Likewise, statements that amount to mere unsupported characterizations, personal opinions, or subjective beliefs do not create a triable issue.  Garcia-Garcia, 878 F.3d at 425 (plaintiff "provides no detail and no support other than his subjective belief that he was being discriminated against by Costco"); Quinones v. Buick, 436 F.3d 284, 290 (1st Cir. 2006) (discounting plaintiff's affidavit which, "like his deposition testimony, reflects only Quinones' subjective speculation and suspicion that Barnes' greater earnings" resulted "from discrimination").
[29]  See footnote 12 and related text.

(Docket Entry # 252-1, p. 15).  As alleged in the grievance,
plaintiff asserts that Allen disciplined him and targeted him
"on many occasions" "[a]t the request of Sgt. Sullivan."
(Docket Entry # 252-1, p. 15).  The grievance requests "all
camera footage from May 25th, 2014 be preserved" and that SCHOC
"do whatever [it] deem[s] necessary to C.O. Allen."  (Docket
Entry # 252-1, p. 15).  The Institutional Grievance Coordinator
denied the grievance on the ground that inmates "must have
[their] I.D. on . . . whenever [they] leave [their] cell."
(Docket Entry # 252-1, p. 15).

     On June 3, 2014, plaintiff filed another grievance, this
time relating to the May 29 incident.[30]  (Docket Entry # 252-1,
p. 19).  In this grievance, plaintiff recites the events that
led to Allen issuing the May 29, 2014 disciplinary report and
plaintiff's placement in segregation until June 3.  The
grievance alleges that the confinement resulted in the
destruction of plaintiff's legal materials, including "evidence
from 3 open cases," as well as "music lyrics," a screenplay,

---

[30]  The first line of the grievance identifies May 29, 2014 as
the date of the incident and the description of the facts in the
grievance relate to the events that took place on May 29, 2014.
This court assumes that the description's additional reference
to the events as taking place on June 3, 2014 is a mistake.
(Docket Entry # 252-1, p. 19).

book(s), and "business plans."[31]  (Docket Entry # 252-1, p. 19).
The Institutional Grievance Coordinator rejected the grievance
on the basis that plaintiff's "own actions" on May 29 "cause[d]
the abusive behavior and created the situation."  (Docket Entry
# 252-1, p. 19).

On June 4, 2014, plaintiff filed another grievance with
SCSD alleging that on May 29, 2014, Sullivan and Allen threw
away some of plaintiff's property, including court cases,
written motions, and all of plaintiff's legal work.  (Docket
Entry # 252-1, p. 20).  The grievance also complains about
Sullivan and Allen throwing away other items of plaintiff's
property in plaintiff's cell on May 29, 2014.  (Docket Entry #
252-1, p. 20).  These items consist of the three "yellow legal
pads with music lyrics," one "yellow pad with a screenplay" for
"a movie," one "yellow pad with a book," and "business plans."
(Docket Entry # 252-1, p. 20).  The Institutional Grievance
Coordinator "returned" the grievance because plaintiff "received
all property and items from [his] property bag" and because
plaintiff "signed the inventory sheet" describing the property
that was returned.  (Docket Entry # 252-1, p. 20).

---

[31]  The latter category of material corresponds to the
"intellectual property" identified in the governing complaint
that forms the basis for the First Amendment freedom of speech
or expression claim in Count II.  (Docket Entry # 100, ¶¶ 31,
49, 51).

Similarly, in plaintiff's June 8, 2014 appeal he reported the alleged antagonistic behavior of Sullivan and Allen and once again alleged his property had been thrown away.  (Docket Entry # 252-1, p. 21).  The disciplinary hearing's decision was modified because "the situation could have been handled informally" and because the video "did not support any accusation of discrimination."  (Docket Entry # 252-1, p. 21).  Plaintiff filed a classification appeal on June 18, 2014, of the decision dated June 2, 2014, i.e., the decision regarding the disciplinary charge based on the May 29, 2014 incident, and other purported harassment by Sullivan and Allen.  (Docket Entry # 252-1, pp. 18, 22).  The classification appeal was denied because it was not "a disciplinary appeal, nor a forum for [plaintiff] to negotiate for what [he] believe[d] [he] suffered."  (Docket Entry # 252-1, p. 22).  Further, the SID investigation concluded that plaintiff's "property was neither lost, nor destroyed."[32]  (Docket Entry # 244-14, p. 1, ¶¶ 1-4).  On June 2, 2014, plaintiff "was released from segregation and moved to [the] 3-1 housing unit."  (Docket Entry # 244-1, ¶ 2(d)).

---

[32]  At his August 3, 2017 deposition, plaintiff testified there was no evidence from the video surveillance that Trotman or Dorgan physically destroyed his legal documents.  (Docket Entry # 244-15, pp. 8, 11-12, 14-15).

On June 17, 2014, plaintiff filed an appeal relating to the April 2014 incident and disciplinary report lodged by "HOC staff." (Docket Entry # 252-1, p. 23). Plaintiff's appeal was denied on the ground that even if plaintiff was switching showers, plaintiff was still required to "be fully dressed when coming out of the shower." (Docket Entry # 252-1, p. 23).

On June 26, 2014, Correctional Officer E. Hestor ("Hestor") filed a disciplinary report against plaintiff relating to a fight plaintiff had with his cellmate. (Docket Entry # 252-1, p. 28). According to Hestor's report, plaintiff and his cellmate were "escorted out of the unit" after this altercation. (Docket Entry # 252-1, p. 28). Plaintiff filed a grievance regarding this altercation on July 1, 2014. (Docket Entry # 252-1, p. 29).

As stated in the July 2014 grievance, plaintiff alleges that the June 26 fight between him and his cellmate was over the fact that their "property was confused and a few belongings of [plaintiff's] ended up in [his cellmate's] property bag or in [segregation] with [his cellmate]." (Docket Entry # 252-1, p. 29). As a result, the grievance requests that "someone . . . check [the] property bags" and locate plaintiff's belongings. (Docket Entry # 252-1, p. 29). The belongings consist of an "address book" and "2 books of stamps." (Docket Entry # 252-1, p. 29). The decision by the Institutional Grievance Coordinator

stated the plaintiff "[received] all property that was gathered
from [his] property bag." (Docket Entry # 252-1, p. 29). The
Institutional Grievance Coordinator also explained that "the
property office [would] bring [plaintiff] another bag of manila
envelopes," and his address book might be located inside.
(Docket Entry # 252-1, p. 29).

When asked about the loss of legal materials during his
August 3, 2017 deposition, plaintiff testified he "need[ed] to
prepare a suppression motion" and "a dismissal motion in the
next twenty days." (Docket Entry # 244-15, pp. 18, 21-22).
Plaintiff nevertheless acknowledged he was able to file motions
during this time period, did not miss a court date, and had
"access to [Attorney] Martin and a paralegal." (Docket Entry #
244-15, p. 22). Plaintiff also had access to the law library.
(Docket Entry # 244-15, pp. 17-18, 22). He further agreed that
he was "able to file motions on all of [his] criminal files."
(Docket Entry # 244-15, pp. 22-23). Defendants and plaintiff
agree that "[d]uring relevant time periods, [plaintiff] had
three pending criminal matters in Suffolk Superior Court: 1384
CR 10977 ("CR 10977); 1384 CR 11140; and 1484 CR 11124" ("CR
11124"). (Docket Entry # 244, p. 9, ¶ 47) (Docket Entry # 256,
p. 28, ¶ 153) (Docket Entry ## 244-24 to 244-26) (Docket Entry #
252-1, pp. 87, 92). Plaintiff was not arraigned in CR 11124,

however, until December 22, 2014.[33]  (Docket Entry # 244-26, pp.
6-7).  (Docket Entry # 244-15, pp. 22-23).

C.  Access to Legal Materials, Legal Services at SCHOC, and
Return of Legal Materials

At SCHOC, "[c]onsistent with Policy S480, inmates have
access to a law library, legal materials, typewriters (for *pro
se* inmates) and assistance from the ILS attorney or a person
trained in the law."  (Docket Entry # 244-22, p. 1, ¶¶ 1-4)
(Docket Entry # 244-23).  When needed, "ILS and/ or the law
library store excess legal materials for inmates."  (Docket
Entry # 244-22, p. 1, ¶ 5).  When plaintiff arrived at SCHOC in
2013, ILS stored his "excess legal materials in the law
library."[34]  (Docket Entry # 244-22, pp. 1-2, ¶ 8).  "On April
11, 2014, ILS received legal materials belonging to
[plaintiff]," which were also "stored" and made "available for
[plaintiff]."  (Docket Entry # 244-22, p. 2, ¶ 9(a)).  "At all
times, [plaintiff] had access to all [of his] legal materials
stored by ILS" except during his temporary stay in segregation.
(Docket Entry # 244-22, pp. 1-2, ¶ 8) (emphasis added).  During
plaintiff's incarceration at SCHOC, he was:

---

[33]  The discussion section includes additional facts relative to
plaintiff's three open criminal prosecutions against him in
2014.
[34]  Excess materials "are these materials that exceed the size of
one cubic sized box."  (Docket Entry # 244-22, pp. 1-2, ¶ 8).

> [A]fforded all services as outlined in Policy S480.
> Specifically, ILS provided legal services, access to stored
> legal documents, access to legal materials . . ., access to
> copying, printing services; and legal aid in drafting
> motions.  [Plaintiff] regularly used the law library and
> all services offered by ILS.[35]

(Docket Entry # 244-22, p. 1, ¶ 6).

While housed in segregation, plaintiff was still "afforded
ILS services, including the ability to ask ILS to provide him
access to stored legal materials held by ILS or secured in
booking storage."  (Docket Entry # 244-22, p. 1, ¶ 7) (Docket
Entry # 244-11).  Additionally, while in segregation Dorgan
delivered the bag of plaintiff's property, which contained legal
materials consisting of legal cases.  (Docket Entry # 244-15, p.
5).  On June 3, 2014, plaintiff received a box containing legal
materials from Sergeant Depina.  (Docket Entry # 244-6) (Docket
Entry # 252-1, pp. 87, 92) (Docket Entry # 244-15, pp. 6-7, 16).
Viewing the record in plaintiff's favor and as previously noted,
the property Sergeant Depina delivered at that time did not
include the W.B. Mason box of printed legal cases.  (Docket
Entry # 252-1, pp. 87, 92).  In late June 2014, however, Misci
delivered the W.B. Mason "box of legal materials to [plaintiff]"
(Docket Entry # 244, p. 9, ¶ 45), which the non-stricken

---

[35]  At his August 3, 2017 deposition, plaintiff testified that
following the alleged loss of property, he had access to ILS and
the law library.  (Docket Entry # 244-15, pp. 17-18).

portions of plaintiff's LR. 56.1 statement do not controvert.
See LR. 56.1.

As also noted, in mid-July 2014, Wright found the
additional set of plaintiff's legal materials in manila
envelopes in the segregation property room, which ILS picked up,
stored in the law library, and notified plaintiff of such on
July 22, 2014.  (Docket Entry # 244-9, p. 2, ¶ 10(b)) (Docket
Entry # 244-13) (Docket Entry # 244-22, p. 2, ¶ 9) (Docket Entry
# 244-15, p. 16) (Docket Entry # 252-1, p. 32) (Docket Entry #
244-22, p. 2, ¶ 9(b)).  Accordingly, plaintiff received the W.B.
Mason copy box of legal papers from Misci by late June 2014 and
was notified about the storage of legal papers, which consisted
of the manila envelopes containing legal paperwork, in the law
library on July 22, 2014.

The forgoing matters in the summary judgment record,
including Sullivan, Dorgan, and Trotman's averments that they
did not destroy or confiscate plaintiff's personal property or
legal materials (Docket Entry # 244-3, p. 2, ¶ 11) (Docket Entry
# 244-5, p. 1, ¶ 5) (Docket Entry # 244-7, p. 1, ¶ 6), establish
that plaintiff received the W.B. Mason copy box of legal papers
by late June 2014 and had access to all other legal papers
(including the manila envelopes with legal paperwork) stored in
the law library no later than July 22, 2014, and that the
foregoing defendants did not destroy or confiscate plaintiff's

property on May 29, 2014.  The fact that plaintiff filed a
motion in CR 10977 on July 21, 2014, arguing or alleging the
destruction or confiscation (Docket Entry # 244-24, p. 22)
(Docket Entry # 252-1, pp. 89-90) does not give rise of a
genuinely disputed fact to the contrary.[36]  See generally Barrett
v. Lombardi, 239 F.3d 23, 27 (1st Cir. 2001) (allegations and
statements in legal memorandum are not adequate to forestall
summary judgment).

D.  Knowledge of Grievances

As of May 29, 2014, Barrows, Sullivan, Allen, and Trotman
"had no knowledge (a) that [plaintiff] had filed grievances; (b)
that [plaintiff] had pending criminal matters; or (c) that
[plaintiff . . .] was pro se."  (Docket Entry # 244-2, ¶ 4)
(Docket Entry # 244-3, p. 2, ¶ 12) (Docket Entry # 244-4, ¶ 6)
(Docket Entry # 244-7, p. 1, ¶ 8).  As of May 29, 2014, Dorgan
"had no knowledge that [plaintiff] had filed grievances."
(Docket Entry # 244-5, p. 1, ¶ 7).  As part of the SID
investigation regarding plaintiff's "claimed loss of property of
May 29, 2014" (Docket Entry # 244-14, p. 1, ¶ 2), SID
investigators interviewed Sullivan and Allen.  During her
interview, Sullivan described plaintiff as a "litigious type of

---

[36]   The accompanying affidavit is dated July 16 and notarized on
July 18, 2014 (Docket Entry # 252-1, p. 92), prior to the July
22, 2014 notification.

inmate." (Docket Entry # 253, Audio Compact Disc of SID
Interviews). She further stated she could not make an agreement
with plaintiff to, for example, lose an hour of recreation time
in lieu of receiving a disciplinary report as he "seemed . . .
the type of person that needed" to "grieve" the matter. (Docket
Entry # 253, Audio Compact Disc of SID Interviews). During the
interview, she also stated that she "did not know" plaintiff had
filed grievances against her. (Docket Entry # 253, Audio
Compact Disc of SID Interviews).

E.   SCHOC Grievance Policy

     Starting in 2014, Inmate Grievance Policy "S-491 [was] in
effect." (Docket Entry # 244-27, ¶ 2) (Docket Entry # 244-28).
Plaintiff "filed numerous grievances" during his stay at the
SCHOC. (Docket Entry # 244-27, ¶ 4). "Resolving inmate
grievances does not require that each correction officer be
advised of every instance that an inmate cites him/her in a
grievance." (Docket Entry # 244-27, ¶ 3). As such, the Inmate
Grievance Coordinator "did not inform" Trotman, Allen, Sullivan,
Barrows, or Libby that plaintiff had filed grievances against
them.[37] (Docket Entry # 244-27, ¶ 4). Additionally, as of May
29, 2014, Trotman, Dorgan, Barrows, Sullivan, and Allen had no

_____

[37] The Inmate Grievance Coordinator's responsibility includes
"administering the Inmate Grievance Policy S-491; investigating
grievances; and responding to the inmates regarding their
grievances." (Docket Entry # 244-27, ¶ 2).

knowledge that [plaintiff] had filed grievances.  (Docket Entry # 244-2, ¶ 4) (Docket Entry # 244-3, p. 2, ¶ 12) (Docket Entry # 244-4, ¶ 6) (Docket Entry # 244-5, p. 1, ¶ 7) (Docket Entry # 244-7, p. 1, ¶ 8).  As previously noted, plaintiff submitted a signed grievance related to the May 29, 2014 inventory on June 4, 2014.  (Docket Entry # 244-15, p. 2) (Docket Entry # 244-29).  On June 13, 2014, a response was given to plaintiff by SCHOC that he had "received all property and items from [his] property bag in [his] cell," and that he "signed the inventory sheet." (Docket Entry # 244-29).  At his August 3, 2017 deposition, plaintiff testified that he had no evidence that Trotman knew that plaintiff had filed grievances prior to May 2014.  (Docket Entry # 244-15, p. 9).

F.   August 7, 2014 Incident

On August 7, 2014, the day before plaintiff's release from SCHOC, Libby[38] entered plaintiff's cell and proceeded to ransack "all his legal materials."  (Docket Entry # 244-8, p. 7, ¶ 29). During this "cell search," Libby said to plaintiff that "'he had better throw away some of his trash or he would do it for him.'"

---

[38]  The governing complaint refers to Trotman as the individual who ransacked plaintiff's cell on August 7, 2014.  (Docket Entry # 100, ¶ 29).  In December 2017, plaintiff moved to substitute Libby for Trotman as the individual who ransacked his cell (Docket Entry # 184), which this court allowed.  Accordingly, when referring to this incident, this court refers to Libby as opposed to Trotman.

(Docket Entry # 244-8, p. 7, ¶ 29).  Libby then looked at "the

mess and asked" plaintiff "if he was pro se."  (Docket Entry #

244-8, p. 7, ¶ 29).[39]

DISCUSSION

I.   Conversion (Count I)

Defendants seek summary judgment on the conversion claim on

the basis that plaintiff fails to establish a prima facie case.

(Docket Entry # 243, p. 6).  Plaintiff contends that Trotman,

Dorgan, and Sullivan violated "his property rights by

conversion."  (Docket Entry # 252, p. 24).[40]

---

[39]  Defendants cite the above allegations in the governing
complaint as "taken in favor of the [plaintiff]" "for purposes
of summary judgment" and therefore as setting out the summary
judgment facts of the August 7th events.  (Docket Entry # 243,
p. 17).  "[C]lear[] and unambiguous[]" allegations from a
complaint may be used as judicial admissions in support of
summary judgment.  Schott Motorcycle Supply, Inc. v. Am. Honda
Motor Co., 976 F.2d 58, 61 (1st Cir. 1992) ("'party's assertion
of fact in a pleading is a judicial admission by which it
normally is bound throughout the course of the proceeding'" and
finding "that plaintiff should not be allowed to contradict its
express factual assertion in an attempt to avoid summary
judgment") (internal citations omitted); see, e.g., Aretakis v.
Gen. Signal, Inc., Civil Action No. 05-10257-DPW, 2006 WL
1581781, at *1 (D. Mass. June 7, 2006) ("consider[ing] as
admitted the undisputed assertions in the Complaint . . . for
purposes of [the summary judgment] motion").
[40]  Plaintiff argues that Allen as well as Trotman, Dorgan, and
Sullivan are liable in Count I.  (Docket Entry # 252, p. 24).
The October 2017 Memorandum and Order required plaintiff to
identify "the causes of action in the existing complaint that
[he] seeks to bring against Sullivan and Allen" in allowing
leave to amend the complaint to include Sullivan and Allen.
(Docket Entry # 174, p. 7).  In the statement, plaintiff
identified only Sullivan and not Allen with respect to Count I.
(Docket Entry # 185, p. 5).

Conversion requires "'"an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."'" Damon v. Hukowicz, 964 F. Supp. 2d 120, 141 (D. Mass. 2013) (internal citations omitted); Third Nat'l Bank of Hampden Cnty. v. Cont'l Ins. Co., 446 N.E.2d 380, 383 (Mass. 1983); see Reem Prop., LLC v. Engleby, 251 F. Supp. 3d 274, 278 (D. Mass. 2017) (defining conversion).  "The elements of the tort of conversion" are the following:

> (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

Reem Prop., 251 F. Supp. 3d at 278 (internal citation omitted); see Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 (1st Cir. 1993).

A.   Right of Possession

For a conversion claim to have merit, "'[i]t is incumbent on a plaintiff in such action to prove a right of immediate possession of the property at the date of the writ.'"  Previte v. Jianfeng He, Case No. 18-P-661, 2019 WL 2157584, at *4 (Mass. App. Ct. May 17, 2019) (unpublished) (brackets in original)

45

(quoting <u>MacNeil v. Hazelton</u>, 28 N.E.2d 477, 478 (Mass. 1940)).
"In order to recover for conversion, plaintiffs must show that
at the time of the alleged conversion they had either actual
possession or the right to immediate possession or control of
the property in question." <u>In re 604 Columbus Ave. Realty Tr.</u>,
968 F.2d 1332, 1358 (1st Cir. 1992).  The plaintiff must have
"had either the right to immediate possession or title to the
property allegedly converted." <u>Beliveau v. Ware</u>, 33 N.E.3d 459,
462 (Mass. App. Ct. 2015) (acknowledging conversion requires
plaintiff to prove right to immediate possession).  "The
plaintiff must have had a present legal right to immediate
possession of the property." <u>Jalbert v. Grautski</u>, 554 F. Supp.
2d 57, 74 (D. Mass. 2008).

In the case at bar, defendants argue that no conversion
occurred because plaintiff did not have the immediate right to
possess his property when he was moved to segregation.  (Docket
Entry # 243, pp. 6-8).  Plaintiff maintains that he "not only
owned the property [but also that] he had a clearly established
interest that was known to be his pro se status in numerous
legal cases."  (Docket Entry # 252, p. 26).

Although plaintiff is correct that he does own the
property, "there is a difference between the right to own
property and the right to possess property while in prison."
<u>Mason v. Dep't of Corr.</u>, Case No. 08-P-1930, 2009 WL 3615043, at

*1 (Mass. App. Ct. Nov. 4, 2009) (unpublished); see also
Commonwealth v. Ecker, 84 N.E.3d 883, 887 (Mass. App. Ct. 2017)
(acknowledging circumstance of confinement restricts inmate's
rights).  As an inmate, plaintiff "has certain ownership rights,
but he does not have unlimited rights to possess property in
prison."  Puleio v. Dep't of Corr., No. 14-P-1455, 2016 WL
1273139, at *2 (Mass. App. Ct. 2016) (unpublished) (table); see
Thornton v. Merchant, Civil Action No. H-10-0616, 2011 WL
147929, at *10 (S.D. Tex. Jan. 18, 2011) (inmate "has no legally
protected interest in the possession of personal property as a
general matter").  It is also "well settled that prison
officials may impose reasonable restrictions on the type and
amount of personal property that inmates are allowed to possess
while in prison."  Thornton, 2011 WL 147929, at *10.  For
example, a confiscation and conversion of inmate property,
consisting of a package containing a collage for outgoing mail,
on the basis of the legitimate penological purpose that it
contained contraband does not survive summary judgment because
incarceration abates "'possessory interests in personal
effects,'" and the legitimate penological purpose forecloses the
inmate's ability to show that the adverse action "would not have
occurred 'but for' the alleged wrongful conduct."  Salameh v.
Duval, Civil Action No. 12-10165-RGS, 2014 WL 691610, at *4 (D.
Mass. Feb. 21, 2014) (internal citations omitted); see also

<u>Torres v. Fla. Dep't of Corr.</u>, Case No. 4:15cv464-RH/CAS, 2017 WL 9439165, at *7 (N.D. Fla. Aug. 16, 2017) (noting that "prisoner lacks a protected interest in retaining contraband" and "lawful right to possess" it, and affirming dismissal of due process claim when officer confiscated money which was "contraband" under prison rules); <u>accord</u> <u>Baker v. Piggott</u>, 833 F.2d 1539, 1540 (11th Cir. 1987).

Here, the diminution of plaintiff's right to possess property that be owns in prison coupled with the collection and storage of his excess property in accordance with reasonable SCHOC policies warrants summary judgment on the basis that plaintiff did not have the right to immediate possession or actual possession of the excess property at the time of conversion.  <u>See</u> <u>In re 604 Columbus Ave. Realty Tr.</u>, 968 F.2d at 1358.  SCHOC restricts within limits the amount of property an inmate may have in his general population cell to one cubic foot.  (Docket Entry # 244-9, p. 1, ¶ 6).  Regarding the latter, plaintiff was not present at the time of the May 29, 2014 inventory and alleged conversion as he had been moved to segregation.  On May 29, 2014, plaintiff had more than one cubic foot of property in his cell and, hence, no immediate right to possess such excess items, as dictated by Policy S403.  (Docket Entry # 244-9, p. 1, ¶ 3) (Docket Entry # 244-10).  Additionally, in segregation, he had no right to immediate

possession of property beyond the permitted personal items in the government bag which Dorgan delivered to plaintiff in segregation, as provided for under Policy S422.  (Docket Entry # 244-5) (Docket Entry # 244-11).

In accordance with SCHOC policy, Sullivan, Dorgan, and Trotman inventoried plaintiff's property, and Dorgan and Trotman transported the inventoried property as previously described after plaintiff's removal to the segregation unit due to disciplinary infractions.  (Docket Entry # 272, Ex. 13A-13C) (Docket Entry # 244-3, pp. 1-2, ¶¶ 4-10) (Docket Entry # 244-7, p. 1, ¶¶ 3-7) (Docket Entry # 244-5, p. 1, ¶¶ 3-6) (Docket Entry # 244-4, ¶¶ 4-5).  Sullivan, Dorgan, and Trotman collected materials in accordance with SCHOC Policies S403 and S422.  (Docket Entry # 272, Ex. 13A) (Docket Entry ## 244-3, 244-5, 244-7, 244-10, 244-11) (Docket Entry # 244-9, pp. 1-2, ¶¶ 8-9).  As required under Policy S422, Trotman transported the excess materials to the booking area for storage, and Dorgan transported the two bags to MC and plaintiff in segregation.  (Docket Entry # 272, Ex. 13B-13C) (Docket Entry # 244-3, p. 1, ¶ 9) (Docket Entry # 244-5, p. 1, ¶ 6) (Docket Entry # 244-7, p. 1, ¶ 7).  Upon his release from segregation, Sergeant Depina returned the property to plaintiff "except for a WB Mason box of printed legal cases from [ILS] and assorted canteen items."  (Docket Entry # 252-1, pp. 87, 92).  When Sergeant Depina

49

delivered the property to plaintiff, plaintiff signed the inmate property inventory sheet acknowledging the return of the inventoried items.[41]  (Docket Entry # 244-6) (Docket Entry # 244-15, pp. 6-7).  Thereafter, plaintiff received the W.B. Mason copy box of legal papers in late June 2014 and had access to the excess legal papers consisting of the manila envelopes containing legal paperwork in the law library as of July 22, 2014.

Plaintiff nevertheless maintains that the facts "clearly demonstrate a due process violation of the plaintiffs' [sic] property rights, [and] the conversion of property flows from the facts and laws in the former."  (Docket Entry # 252, p. 25).  First, as explained with respect to Count IV, the due process claim based on the May 29, 2014 confiscation is subject to summary judgment.  Hence, the premise of plaintiff's argument, i.e., a due process violation, is absent.  Second, in the context of due process, plaintiff, as an inmate, does not have "unlimited rights to possess" his property.  Puleio, 2016 WL 1273139, at *2 (affirming dismissal of due process claim because disposal of inmate's property was in accordance with prison property policy in Policy S403).

---

[41]  Plaintiff did not initial the sheet at the time Dorgan delivered the trash bag of items to plaintiff in segregation on May 29, 2014.  (Docket Entry # 244-6) (Docket Entry # 244-15, p. 7).

In sum, because plaintiff "does not have unlimited rights to possess property in prison," Puleio, 2016 WL 1273139, at *2, he lacks the requisite possessory interest or immediate right to possession of the excess property at the time of the alleged conversion.  See Reem Prop., LLC, 251 F. Supp. 3d at 278 (recognizing ownership or possessory interest at the time of alleged conversion as required element of conversion claim).  In accordance with the above discussion, the conversion claim is subject to summary judgment given the insufficient evidence to support this element.

B.  Dominion Over Plaintiff's Property with Intent to Deprive Plaintiff

In the alternative, defendants argue that plaintiff fails to establish a genuine issue of material fact that Sullivan, Dorgan, or Trotman wrongfully denied plaintiff his property or acted with the wrongful intent to deprive him of his property. (Docket Entry # 243, p. 7).  They point out that Dorgan and Trotman acted in accordance with SCHOC policies by inventorying the property, delivering the bag to plaintiff in segregation, and storing the excess remainder.  (Docket Entry # 243, p. 7). Plaintiff argues that Trotman and Dorgan breached their "absolute duty" by wrongfully and intentionally exercising control of plaintiff's property when they did not adhere to Sullivan's instruction to bring all of plaintiff's legal

51

property to plaintiff in segregation.  (Docket Entry # 252, p.
25).  Plaintiff submits that conversion is a "strict liability
tort" and that a showing of wrongful intent by a defendant is
not required.  (Docket Entry # 252, p. 27).  Plaintiff maintains
that Trotman and Dorgan had an "absolute duty" to adhere to
Sullivan's instruction to bring all of plaintiff's property to
plaintiff in segregation.  (Docket Entry # 252, pp. 25-26).

First, plaintiff's characterization of conversion as a
"'strict liability tort'" that renders "'defendants['] good
faith, lack of knowledge, and motive . . . ordinarily
immaterial'" (Docket Entry # 252, p. 27) (quoting California
state court case) is misplaced.  The applicable law is
Massachusetts, not California, state law.  Conversion under
Massachusetts law requires that "'the defendant intentionally
and wrongfully exercised control or dominion over'" plaintiff's
"'personal property.'"  Reem Prop., Inc., 251 F. Supp. 3d at 278
(citation omitted).  Plaintiff bears the underlying burden to
show that Trotman and Dorgan acted intentionally and wrongfully
to appropriate plaintiff's property.  See Kelley v. LaForce, 288
F.3d 1, 11-12 (1st Cir. 2002) (recognizing conversion claim
requires showing wrongful act with intent to appropriate
property); Fiorillo v. Winiker, 85 F. Supp. 3d 565, 575 (D.
Mass. 2015) (conversion claim requires proof of defendant's
intent "to appropriate" or "deprive" property).  "'[A]n act

which is not intended to exercise dominion or control over a
chattel but is merely negligent with respect to it is not a
conversion, even though it may result in the loss or destruction
of the chattel.'" Powell v. Holmes, Civil Action No. 17-10776-
FDS, 2018 WL 662482, at *6 (D. Mass. Feb. 1, 2018) (internal
citations omitted). As explained by the First Circuit in
Kelley, an "action for conversion cannot be maintained without
proof that the defendant either did some positive wrongful act
with the intention to appropriate the property to himself or to
deprive the rightful owner . . . or destroyed the property."
Kelley, 288 F.3d at 12 (internal quotation marks and citations
omitted); Fiorillo, 85 F. Supp. 3d at 575.

In considering if an action amounts to a conversion, courts
examine the circumstances which surround it. See Damon, 964 F.
Supp. 2d at 142; Cahaly v. Benistar Prop. Exch. Tr. Co., Inc.,
864 N.E.2d 548, 559 (Mass. App. Ct. 2007); see also Restatement
(Second) of Torts § 222A (2020) (citing factors courts should
consider when assessing conversion claim). Contrary to
plaintiff's position, these circumstances include the
defendant's good faith as well as the following:

> the extent and duration of the defendant's exercise of
> control; [their] intent to assert a right . . .
> inconsistent with . . . plaintiff's right of control; the
> defendant's good faith or bad intention; the extent and
> duration of the resulting interference with the plaintiff's
> right of control; the harm done to the chattel; and the
> expense and inconvenience caused to the plaintiff.

53

Cahaly, 864 N.E.2d at 559, n.18 (citing Restatement (Second) of
Torts § 222A(2) (1965)).

The circumstances at issue in Damon and Kelley exemplify
why, in the case at bar, Sullivan, Dorgan, and Trotman's actions
do not constitute a conversion because they did not engage in
any wrongful act with a deliberate intent to deprive plaintiff
of his property.  See Kelley, 288 F.3d at 11-12; Damon, 964 F.
Supp. 2d at 142.  In Damon, the officer's conduct when the
plaintiff's property was collected was permissible because the
officer was acting within the reasonable scope of his
professional duty.  See Damon, 964 F. Supp. 2d at 142.  The
officer was not "asserting his own right to [the bicycle]," but
rather acting within the scope of his job to serve "legitimate
safety concerns."  Id.

In the case at bar and as explained above, Sullivan,
Trotman, and Dorgan controlled plaintiff's property relative to
the May 29 inventory not for personal use but, rather, in
accordance with their duty to enforce and adhere to SCHOC Policy
S403, Policy S422, and SCHOC procedures.  As to the initially
unreturned W.B. Mason box of legal material, Misci delivered the
copy box to plaintiff in late June 2014.  (Docket Entry # 244,
p. 9, ¶ 45) (citing Docket Entry # 244-12); (Docket Entry # 244-
9, ¶ 10(a)).  The only reasonable inference is that this copy

box of legal papers is the W.B. Mason box of legal cases that
plaintiff attests (Docket Entry # 252-1, pp. 87, 92) Sergeant
Depina did not deliver to plaintiff on June 3, 2014.  Misci
returned this property after a short period of time on June 26,
2014, following plaintiff's release from segregation.  (Docket
Entry # 244-12) (Docket Entry # 244-9, ¶ 10(a)).  In mid-July
2014, Wright found the bag with the manila envelopes containing
legal paperwork when she was cleaning the segregation property
room.  (Docket Entry # 244-13) (Docket Entry # 244-9, ¶ 10(b)).
ILS retrieved these legal materials from Wright and stored these
excess materials in the law library, and plaintiff received
notice that his legal papers were secured in the law library on
July 22, 2014.  (Docket Entry # 244-22, ¶¶ 5, 9(b)) (Docket
Entry # 244-13) (Docket Entry # 244-9, ¶ 10(b)).  The duration
of the deprivation was brief and by and large not inconsistent
with plaintiff's right to control the property.  The legal
materials were not destroyed but, rather, either returned to
plaintiff or plaintiff had access to them by late July 2014.

Overall, the record establishes that all plaintiff's
belongings were possessed with the intention of following prison
procedure rather than with the intent to deprive plaintiff

permanently of the property.[42]   See Damon, 964 F. Supp. 2d at

141-42; Eveden, Inc. v. N. Assurance Co. of Am., Civil Action

No. 10-10061-GAO, 2014 WL 952643, at *4 (D. Mass. Mar. 12, 2014)

(taking control over property in compliance with a legal

requirement did not amount to an act of conversion).   In

contrast, the defendants in Kelley demonstrated a clear intent

to deprive the plaintiff of her property by changing the locks

---

[42]   Whereas plaintiff also attests that Sergeant Depina did not
deliver "assorted canteen items" to plaintiff on June 3, 2014
(Docket Entry # 252-1, pp. 87, 92), plaintiff's 93-page
opposition fails to adequately develop an argument regarding the
non-delivery of "assorted canteen items."   (Docket Entry # 252).
Although the opposition does reference "personal property" a
number of times, the opposition identifies non-legal property as
his "music, books, business plans, screen plays etc." (Docket
Entry # 252, pp. 65-66, 70).   Plaintiff therefore waives a claim
for conversion of assorted canteen items and, more broadly,
liability on the other causes of action based on the non-
delivery of "assorted canteen items."   See Eldridge v. Gordon
Bros. Grp., L.L.C., 863 F.3d 66, 84 (1st Cir. 2017) (rejecting
plaintiff's argument that district judge should have exercised
his discretion and addressed merits of plaintiff's waived
summary judgment argument in plaintiff's opposition rather than
rely on waiver); Curet-Velázquez v. ACEMLA de P.R., Inc., 656
F.3d 47, 54 (1st Cir. 2011) ("[a]rguments alluded to but not
properly developed before a magistrate judge are deemed
waived"); Coons v. Indus. Knife Co., Inc., 620 F.3d 38, 44 (1st
Cir. 2010) ("district court was 'free to disregard' the state
law argument that was not developed in Coons's brief").
Relatedly, with respect to plaintiff's personal or intellectual
property consisting of his music, books, business plans, and
screenplays, plaintiff's opposition references such property
only with respect to the freedom of speech and expression claim
in Count Two and the MCRA claim in Count Five.   (Docket Entry #
252, pp. 65-66, 70).   Plaintiff therefore waives a conversion of
the music, books, business plans, and screenplays and, more
broadly, other causes of action except for the freedom of speech
and expression claim and the MCRA claim.   See Eldridge, 863 F.3d
at 84; Curet-Velázquez, 656 F.3d at 54; Coons, 620 F.3d at 44.

on plaintiff's pub to deny her entry.  See Kelley, 288 F.3d at

12.  Unlike the case at bar, the defendants in Kelley possessed

the plaintiff's property under their professional obligations

with the intent to deprive the plaintiff of access to her pub.

See id.

Second, plaintiff's "absolute duty" argument (Docket Entry

# 252, pp. 10, 25) is misguided.  Plaintiff argues that Trotman

and Dorgan did not adhere to Sullivan's instruction to bring all

of plaintiff's legal property to plaintiff in segregation.

(Docket Entry # 252, pp. 10, 25).  Based on their positions as

correction officers, Trotman and Dorgan had an absolute duty to

abide by Sullivan's orders, according to plaintiff.  (Docket

Entry # 252, pp. 10, 25).  The argument founders, however,

because it relies on facts that are stricken from the record,

namely, that Sullivan gave an order, albeit using "irregular"

wording.  (Docket Entry # 252, p. 25) (citing exhibit A9 at

lines 234-243, which is located at Docket Entry # 252-1, p.

109).[43]

Regardless, the fact that Sullivan stated during the SID

interview that she "did not instruct anybody to bring it[44] to

booking, because [plaintiff is] supposed to get his legal mail,

---

[43]  The Memorandum and Order on the motion to strike allows the
motion as to exhibit A9.
[44]  "[I]t" refers to plaintiff's "legal property."  (Docket
Entry # 253, Audio Compact Disc of SID Interviews).

his legal property" (Docket Entry # 253, Audio Compact Disc of SID Interviews) does not show or reasonably infer that she ordered Trotman and Dorgan to transport plaintiff's legal property to plaintiff in segregation in excess of the bag allowed under SCHOC Policy S422.  More to the point, Trotman did not engage in a wrongful act with the intent to deprive plaintiff of his legal property by transporting the box and the bag to the booking area for storage or that Dorgan engaged in a similar wrongful act by not transporting the legal property to plaintiff.  As explained, Trotman's conduct and Dorgan's conduct complied with SCHOC policies.  Further, their conduct was not inconsistent with plaintiff's right of control, the duration of their exercise of control over the legal property was brief, and the property was not damaged or destroyed.  The short period of time until Misci delivered the W.B. Mason box to plaintiff and plaintiff received notification of the storage of legal material in the law library belies any deliberate intent to deprive plaintiff of his property or any wrongful act with the intention to appropriate plaintiff's property.  See Kelley, 288 F.3d at 12; Powell, 2018 WL 662486, at *6.  Accordingly, summary judgment on the conversion claim is warranted in Sullivan, Dorgan, and Trotman's favor based on defendants' alternative argument that Sullivan, Dorgan, and Trotman did not engage in a wrongful act with the intent to deprive plaintiff of his

property or appropriate the property for themselves.  See
Kelley, 288 F.3d at 12 (conversion fails absent "'"proof that
the defendant either did some positive wrongful act with the
intention to appropriate the property to himself or to deprive
the rightful owner of it, or destroyed the property"'")
(internal citations omitted); see, e.g., Damon, 964 F. Supp. 2d
at 141-42.

II.  First Amendment Retaliation (Count II)

     Count II alleges a section 1983 First Amendment retaliation
claim against Trotman, Dorgan, Sullivan, and Allen.[45]  Defendants
move for summary judgment on the basis that plaintiff fails to
show a prima facie case.  (Docket Entry # 243, pp. 8-9).  They
argue that plaintiff cannot prove that Sullivan, Allen, Dorgan,
and Trotman took adverse action.  (Docket Entry # 243, pp. 8-9).
They also argue there is no showing they knew about the
protected activity and, accordingly, there is no causal "'but
for'" connection between plaintiff engaging in the protected
activity and their taking "adverse action against him."  (Docket
Entry # 243, p. 8).  Plaintiff contends that evidence shows that
defendants were aware of his protected activity and further
argues that the circumstances imply that Sullivan, Allen,

---

[45]  See n.7 supra.

Dorgan, and Trotman engaged in adverse action against him for
filing grievances.  (Docket Entry # 252, pp. 48-49).

To prevail on a First Amendment retaliation claim,
plaintiff must prove: (1) he engaged in protected activity; (2)
that defendant "took an adverse action against him;" and (3) "a
causal link between the protected activity and the adverse
action." Staples v. Gerry, 923 F.3d 7, 15 (1st Cir. 2019);
Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011); Schofield v.
Clarke, 769 F. Supp. 2d 42, 47 (D. Mass. 2011); see also Nieves
v. Bartlett, 139 S. Ct. 1715, 1722 (2019) (outlining
requirements to prove First Amendment retaliation claim).  With
respect to the first element, it is undisputed that filing
grievances constitutes protected conduct.  See Hannon, 645 F.3d
at 48-49; see also Mattei v. Dunbar, 217 F. Supp. 3d 367, 374
(D. Mass. 2016) (acknowledging filing grievances is a protected
activity).  Accordingly, this court turns to the foregoing
arguments, all of which implicate the second and third elements
of the prima facie case.

A.  Adverse Act

Count II alleges that Sullivan and Allen retaliated against
plaintiff for filing the April 3 and 23, 2014 grievances by
issuing disciplinary reports.  (Docket Entry # 185, pp. 2-5).
Sullivan also purportedly instructed "Allen to strictly enforce
any and all disciplinary action against" plaintiff, and Allen

therefore proceeded to discipline plaintiff for the May 2014 basketball incident.  (Docket Entry # 185, p. 3).  Count II further alleges that Trotman and Dorgan retaliated against plaintiff for plaintiff's grievances against Sullivan and Allen. (Docket Entry # 100, ¶ 49).

As previously noted, defendants maintain that Trotman, Dorgan, Sullivan, and Allen did not take adverse action against plaintiff.  They further argue that a retaliatory act must rise above a *de minimus* standard.  (Docket Entry # 243, pp. 8-9). Plaintiff contends that Trotman, Dorgan, Sullivan, and Allen's retaliation encompasses not just the May 29, 2014 incident but the series of disciplinary reports filed by Sullivan and Allen following the April 3, 2014 law library grievance.  (Docket Entry # 252, pp. 49-51).

An action is considered "adverse" in the context of a retaliation claim when the act "'would deter persons of "ordinary firmness" from exercising their constitutional rights in the future.'"  See Mattei, 217 F. Supp. 3d at 374 (quoting Starr v. Dube, 334 F. App'x 341, 342 (1st Cir. 2009) (unpublished)).  For example, the mere "filing of a disciplinary charge carrying potentially severe sanctions" does not rise to the level of an adverse action.  Starr v. Dube, 334 F. App'x at 343; see also Peixoto v. Russo, Civil Action No. 16-cv-10428-DJC, 2016 WL 7410774, at *4 (D. Mass. Dec. 22, 2016)

(considering cumulative impact when allegations encompass multiple adverse acts are involved).  Likewise, "a 'single [allegedly unjustified] retaliatory charge that is later dismissed is insufficient to serve as the basis of a" section 1983 action.  Starr v. Dube, 334 F. App'x at *2 (quoting Bridges v. Gilbert, 557 F.3d 541, 555 (7th Cir. 2009)).  More broadly, to form a basis for a First Amendment retaliation claim, the adverse act should be more than *de minimus*.  See Knox v. Mass. Dep't of Corr., Civil Action No. 14-12457-LTS, 2017 WL 3401443, at *13 (D. Mass. Aug. 8, 2017) ("An act must be more than de minimus to constitute an adverse action."); accord Santiago v. Costa, Civil Action No. 18-12421-RGS, 2019 WL 2339521, at *4 (D. Mass. June 3, 2019), *dismissing appeal*, 2019 WL 7494623 (1st Cir. Sept. 10, 2019).  "[A]n adverse action that imposes a 'substantial' impact on an inmate" is considered sufficient. Starr v. Dube, 334 F. App'x at 343 (internal citation omitted). In assessing whether an "inmate[] of 'ordinary firmness' would be deterred from continuing to exercise [his] constitutional rights merely because of the filing of a disciplinary charge," the existence of a non-futile avenue to defend himself against a disciplinary charge mollifies the deterrence.  Id. (internal citation omitted).

     With respect to Sullivan, plaintiff argues that Sullivan retaliated against him because he filed the April 3, 2014

grievance regarding access to the law library (Docket Entry # 252-1, p. 2).  (Docket Entry # 252, p. 49).  When Sullivan found "out about the grievance" on April 10, 2014, she told "plaintiff 'to keep his mouth shut'" and shortly thereafter filed the April 10, 2014 disciplinary report, according to plaintiff.  (Docket Entry # 252, p. 49).

The argument is misguided.  First, SCHOC allows for disciplinary hearings and affords an opportunity for an inmate to testify and present his version of events.  (Docket Entry # 252-1, pp. 4, 8-9).  The sanction imposed in connection with the April 10, 2014 disciplinary report consisted of the minor two-week loss of canteen privileges and a written warning.  (Docket Entry # 252-1, p. 4).  Given these circumstances, no inmate of "'"ordinary firmness,"'" Mattei, 217 F. Supp. 3d at 374, would be deterred from continuing to exercise his constitutional rights.

Plaintiff's argument that Sullivan retaliated against plaintiff again two weeks later by filing a second disciplinary report on April 23, 2014 (Docket Entry # 252, pp. 50-51), also fails to give rise to an adverse action, even when viewed on a cumulative basis.  The fact that plaintiff filed a grievance against Sullivan earlier the same day for using the racial slur against him is temporally close to the disciplinary charges but the charges themselves and the sanction imposed (48 hours of

restricted movement) would not deter an inmate of ordinary firmness from proceeding to exercise his constitutional rights.[46] See Starr v. Dube, 334 F. App'x at 343.  Balancing the need for flexibility to operate SCHOC and plaintiff's constitutional rights, Sullivan's additional conduct of slamming plaintiff's cell door and ordering plaintiff "to lock in [his] cell" for the evening on May 14, 2014 (Docket Entry # 252-1, p. 86), is not sufficiently substantial to amount to adverse action.  See Starr v. Dube, 334 F. App'x at 343; Tibbs v. Samuels, Civil Action No. 13-11095-DJC, 2017 WL 1164484, at *4 (D. Mass. 2017) (noting that "'inquiry must be "tailored to the different circumstances in which retaliation claims arise," bearing in mind that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse"'") (ellipses, citations, and brackets omitted).  In sum, given the absence of sufficient evidence to overcome summary judgment on the adverse action element of a prima facie case as to Sullivan, she is entitled to summary judgment on the First Amendment retaliation claim in Count II.

B.  Retaliatory Motive

---

[46]  Allen, as opposed to Sullivan, filed the May 29, 2014 disciplinary report which resulted in five days of isolation. (Docket Entry # 252-1, pp. 17-18).

As previously stated, defendants also seek summary judgment on the retaliation claim based on the absence of a "'but for'" causal connection between the protected activity and the adverse action. (Docket Entry # 243, p. 8). They submit there is no showing that Sullivan, Allen, Dorgan, and Trotman knew about the protected activity of plaintiff filing the grievances and therefore lacked a retaliatory animus. (Docket Entry # 243, pp. 8-9). Plaintiff argues that Allen worked with Sullivan and therefore knew about her actions on a daily basis and "Sullivan admitted she" and "Allen are on the same page when it comes to disciplining the plaintiff" for his grievances. (Docket Entry # 252, p. 50) (citing portions of plaintiff's unauthenticated transcription of SID interviews at Docket Entry # 252-1, pp. 107, 110). He also maintains that Dorgan and Trotman knew about plaintiff's grievances based on video footage showing Sullivan yelling and "disposing of plaintiff['s] grievances" "in front of Dorgan with Trotman 10 to 15 feet away." (Docket Entry # 252, p. 50) (citing stricken paragraphs in plaintiff's disputed statement of material facts).

As noted above, the third element of a prima facie retaliation claim requires plaintiff to show "a causal link between the protected activity and the adverse action." Staples v. Gerry, 923 F.3d at 15. In discharging this burden on summary judgment by demonstrating that a reasonable finder of

fact could find in his favor, plaintiff "must show that his protected activity 'was a substantial or motivating factor for the adverse action.'"  Id. (internal citation and brackets omitted).  It is also "'intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.'"  Id. n.2 (internal citation omitted); see, e.g., Latimore v. Dep't of Corr., Civil Action No. 12-12260-JGD, 2013 WL 6181082, at *11 (D. Mass. Nov. 22, 2013) (dismissing First Amendment retaliation claims because "Latimore has not alleged that any of the defendants at MCI-Walpole had any knowledge of the grievance").

As the nonmovant, it is incumbent on plaintiff to provide "'submissions of submissions of evidentiary quality that a trialworthy issue persists'" to defeat summary judgment.  Paul v. Murphy, 948 F.3d at 49; Maldonado-Cátala, 876 F.3d at 9. Plaintiff's reliance on his assertions in the unverified governing complaint, the unverified descriptions of the offense in grievances to the extent offered for the truth of the matter asserted, and certain stricken paragraphs in his statement of disputed facts (Docket Entry # 252, pp. 49-54) is therefore inappropriate.

Based on the materials of evidentiary quality in the summary judgment record, the record fails to reasonably infer that Allen, Trotman, and Dorgan knew about prior grievances

plaintiff filed, including the April 23, 2014 grievance against
Sullivan, at the time Trotman and Dorgan participated in the
inventory and allegedly destroyed or confiscated plaintiff's
property on May 29, 2014 while Allen focused on completing
reports related to plaintiff and MC.  (Docket Entry # 244-4, ¶
6) (Docket Entry # 244-5, ¶ 7) (Docket Entry # 244-7, ¶ 8)
(Docket Entry # 244-27, ¶ 4) (Docket Entry # 244-15, p. 9).  The
materials of evidentiary quality also fail to adequately show
that Allen knew about plaintiff's prior grievances when he
ordered plaintiff to remain in his cell for the rest of the
evening on May 25, 2014, or when Allen completed the reports on
May 29, 2014.  (Docket Entry # 244-27, ¶ 4) (Docket Entry # 244-
4, ¶¶ 5-6).  Although this court recognizes that circumstantial
evidence can be sufficient to show the causal link, see Tibbs,
2017 WL 1164484, at *4 (because of difficulty obtaining "direct
evidence of a retaliatory state of mind, a plaintiff can satisfy
this element by introducing circumstantial evidence that
supports a reasonable inference of such retaliatory motive"),
there is an absence of sufficient evidence for a reasonable
finder of fact to find that one or more prior grievances was a
substantial or motivating factor on the part of Trotman or
Dorgan in purportedly destroying or trashing plaintiff's
property on May 29, 2014.  There is also insufficient evidence
to avoid summary judgment based on plaintiff's argument that

"under a conspiracy theory" Allen, Trotman and/or Dorgan "aided
and abetted" the alleged retaliatory practices of Sullivan (and
Allen as to Trotman and Dorgan's aiding and abetting) of filing
disciplinary reports against plaintiff for the exercise of "his
protected right to redress grievances" (Docket Entry # 252, pp.
50, 52-55).

Accordingly, Allen, Trotman, and Dorgan are entitled to
summary judgment on the retaliation claim in Count II given the
lack of evidence of evidentiary quality for a reasonable finder
of fact to find in plaintiff's favor on the third prong.  See,
e.g., Staples v. Gerry, 923 F.3d at 17.

III.  First Amendment Freedom of Speech (Count II)

The second claim in Count II sets out a section 1983 First
Amendment freedom of speech violation against Trotman and
Dorgan.[47]  (Docket Entry # 100, ¶¶ 31, 49, 51).  Defendants move
for summary judgment on the basis that plaintiff cannot prove
the required elements that show the restrictive prison policy at
issue (Policy S403) impeded plaintiff's First Amendment
expression rights.  (Docket Entry # 243, pp. 9-11).  Plaintiff
submits that his right to freedom of speech and expression is

---

[47]  Plaintiff maintains that Sullivan and Allen are also liable
under this freedom of speech claim.  As explained in footnote
seven, Count II does not include a First Amendment claim for
freedom of speech against Sullivan and Allen.  Rather, it sets
out a First Amendment claim for retaliation claim addressed
above in Roman numeral II.

subject to strict scrutiny or intermediate scrutiny, and under either test the deprivation does not serve a compelling government interest.  (Docket Entry # 252, pp. 64-65).  He also asserts that the "regulation," which he fails to identify, is not content neutral.  (Docket Entry # 252, pp. 64-65).  Even if content-neutral, the regulation was unconstitutionally enforced when plaintiff's property was not returned after his release from segregation, according to plaintiff.[48]  (Docket Entry # 252, pp. 67-69).

As explained in footnote ten, this claim pertains to the purported abridgement of plaintiff's First Amendment right to free speech and expression by the May 29, 2014 confiscation and/or destruction of certain items of plaintiff's personal or intellectual property, namely, music lyrics, screenplay(s), books, and business plans.  As discussed below, the claim fails under the analysis of the four factors in Turner v. Safley, 482 U.S. 78, 89-91 (1987).  Furthermore, even if the claim included the confiscation and/or destruction of plaintiff's legal property, it fails for similar reasons under the same Turner analysis.

---

[48]  Plaintiff also argues that "due to an abuse of their position which was not random or unauthorized," Trotman and Dorgan deprived plaintiff of "his due process property rights." (Docket Entry # 252, p. 67).  Count II, however, is a First Amendment free speech and expression claim rather than a procedural due process claim.

A prison inmate maintains "'rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" Id. at 95 (quoting Pell v. Procunier, 417 U.S. 817, 822 (1974)). Although inmates retain constitutional rights while they are incarcerated, their rights, including the "fundamental right" to marry, are "subject to substantial restrictions as a result of incarceration." Id. at 94; see Beard v. Banks, 548 U.S. 521, 528 (2006) ("Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere").

First, plaintiff argument's regarding the application of intermediate or strict scrutiny is not convincing. As explained by the Supreme Court in Turner:

> Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."

Turner, 482 U.S. at 89 (internal citation omitted and brackets in original). Plaintiff's related argument that "the scrutiny test fails" because defendants "violated [plaintiff's] due process rights under the 14th Amendment" and "state law

70

conversion rights" (Docket Entry # 252, pp. 63, 66) and the
curtailment of his expression therefore does not serve a
legitimate government interest is misguided because both claims
do not withstand summary judgment for reasons explained
elsewhere in this opinion.

Second, "when a prison regulation impinges on inmates'
constitutional rights, the regulation is valid if it is
reasonably related to legitimate penological interests."[49]
Turner, 482 U.S. at 89; Hudson v. Spencer, No. 15-2323, 2018 WL
2046094, at *3 (1st Cir. Jan. 23, 2018) ("'prison regulation
which restricts an inmate's First Amendment free exercise rights
is permissible if it is "reasonably related to legitimate
penological interests"'") (internal citations omitted)
(unpublished).  This reasonableness "standard is necessary" in
order to allow "'prison administrators, and not the courts, to

---

[49]  Defendants rely on Policy S403 as the regulation that
reasonably restricted plaintiff's First Amendment right to
freedom of expression.  (Docket Entry # 243, pp. 9-11).  The
First Circuit in Kuperman v. Wrenn, 645 F.3d 69 (1st Cir. 2011),
equated "New Hampshire Department of Corrections Policy and
Procedure Directive 7.17" to a regulation and proceeded to
analyze the freedom of expression claim under Turner, 482 U.S.
at 89.  Kuperman v. Wrenn, 645 F.3d at 71, n.1, 74-77; accord
Beard v. Banks, 548 U.S. at 524-25 ("consider[ing] whether a
Pennsylvania prison policy that 'denies newspapers, magazines,
and photographs' to . . . inmates 'violate[s] the First
Amendment'") (citing Turner, 482 U.S. at 89) (internal citation
omitted).  Adhering to this precedent, this court considers
Policy S403 a regulation within the meaning of Turner and
proceeds with the First Amendment analysis.

71

make the difficult judgments concerning institutional operations.'" Turner, 482 U.S. at 89 (internal ellipses, bracketed text, and citation omitted); see Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (noting deference given to prison officials when assessing reasonableness).  The relevant factors in deciding when a regulation "is 'reasonably related to legitimate penological interests'" consist of: (1) whether there is "a '"valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it;'" (2) whether alternative means to exercise "'the right that remain open to'" the inmate; (3) the impact that accommodating the "'asserted constitutional right'" will "'have on guards'" and "'the allocation of prison resources;'" and (4) whether there "are 'ready alternatives' for furthering the governmental interests available." Beard, 548 U.S. at 529 (quoting Turner, 482 U.S. at 89-90); accord Kuperman v. Wrenn, 645 F.3d 69, 74 (1st Cir. 2011); Hudson v. Spencer, 2018 WL 2046094, at *3.

The first Turner factor examines "whether there is a 'valid, rational connection' between the regulation and a legitimate and governmental interest put forward to justify it." Turner, 482 U.S. at 78.  Policy S403 limits the items of personal property an inmate can possess in his cell to certain items listed in the policy including "writing materials,

correspondence[,] and legal materials (not to exceed 1 cubic ft. in the cell)." (Docket Entry # 244-10, p. 3, ¶ IV(C)).  The same policy provides for the inventory and storage of an inmate's personal property when the inmate is moved to segregation.  (Docket Entry # 244-10, pp. 6-7, V(F)).

Defendants proffer the fire risk as justifying the restrictions.  (Docket Entry 243, p. 10).  Policy S403 fully supports this justification.  It prohibits property that exceeds authorized quantities or "may present a fire or safety hazard." (Docket Entry # 244-10, p. 1, I(B)).  The policy repeats this concern as applicable to excess legal paperwork that an inmate retains in his cell.  (Docket Entry # 244-10, p. 4, ¶ V(A)(6)) (allowing inmates "to retain legal paperwork unless" deemed "an excessive amount (i.e. a possible fire hazard in the cell)"). Policy S430 also includes a rule that allows a seizure of property considered "contraband or of excessive quantity" at any time.  (Docket Entry # 244-10, p. 2, II(A)(3)) (Docket Entry # 244-9, ¶ 3).  Policy S430 and an affidavit by SCHOC Deputy Superintendent Richard McCarthy establish that "[i]tems in excess or not on the [designated] list will be considered contraband." (Docket Entry # 244-10, p. 3, IV(C)) (Docket Entry # 244-9, ¶¶ 3, 4).

Prison policies limiting excess items in a cell to eliminate "fire and other safety hazards are legitimate

penological interests" under Turner's first factor.  Gray v.
Perkins, Civil No. 14-cv-386-PB, 2016 WL 5108030, at *10 (D.N.H.
Sept. 20, 2016) (unpublished); see also Hudson v. Maloney, 326
F. Supp. 2d 206, 209 n.2 (D. Mass. 2004) (Department of
Corrections' "ban on full-size prayer rugs is justified by
appropriate security concerns over the fire hazard and
sanitation problems the rugs pose").  Moreover, the restriction
limiting written materials (including legal paperwork) to one
cubic foot (Docket Entry # 244-9, ¶ 6) (Docket Entry # 244-10,
p. 3, ¶ IV(C)) is logically and rationally connected to reducing
a fire hazard.  See Kuperman, 645 F.3d at 75 (prison official's
statements that "regulation serves the function identified" are
"sufficient when the articulated connections between the
regulation and the penological objective are 'logical ones'")
(paraphrasing and quoting Beard v. Banks, 548 U.S. at 531-32);
see generally Sowell v. Vose, 941 F.2d 32, 35 (1st Cir. 1991)
("unrealistic to expect prison authorities to give all prisoners
unfettered access to all of their legal materials at all times"
because "prisoners live in prison cells" and wardens "may have
good reason, based on considerations of safety and security, to
limit the amount of legal documents and similar materials that
prisoners may keep with them").

     Plaintiff nevertheless argues that the regulation
restricting the expression of his speech was "for non-

penological purposes once the property was not returned."
(Docket Entry # 252, p. 69).   The argument, however, relies
substantially on the unverified governing complaint and evidence
stricken from the summary judgment record.   (Docket Entry # 252,
pp. 68-69).   The materials of evidentiary quality establish that
Sergeant Depina returned plaintiff's property shortly after
plaintiff's release from segregation on June 3, 2014, except for
the WB Mason box of printed legal cases and assorted canteen
items as well as the legal materials consisting of the bag with
manila envelopes Wright located and ILS stored in the law
library on July 22, 2014.   In late June 2014, Misci delivered
the copy paper box of legal papers to plaintiff.   (Docket Entry
# 244m p. 9, ¶ 45) (Docket Entry # 244-12) (Docket Entry # 244-
9, p. 2, ¶ 10(a)).   On July 22, 2014, plaintiff was notified
that legal materials were stored in the law library and he had
access to those materials.   (Docket Entry # 244-22, pp. 1-2, ¶¶
5, 8, 9(b)).   To the extent plaintiff challenges the
regulation's security or safety purposes because delivering the
box to plaintiff in segregation in accordance with Sullivan's
purported order[50] would not have compromised "SCSD['s] interest

---

[50]  Plaintiff submits that Trotman and Dorgan violated Sullivan's
purported order to deliver all of plaintiff's legal material to
plaintiff in segregation.  (Docket Entry # 252, p. 67).  If
Sullivan did not give the order to Trotman and Dorgan, plaintiff
alternatively argues that she ordered Dorgan and Trotman to

in security or safety" (Docket Entry # 252, p. 11), a breach of security is not required to uphold "a regulation designed to prevent it." Kuperman, 645 F.3d at 75. Indeed, the First Circuit in Kuperman rejected a similar argument, namely, that "[Kuperman] personally would not have posed a security risk," as a "non-starter[]." Id. Moreover, the regulation's interest involves safety in the context of preventing fires.

In short, reducing fire hazards is a legitimate safety concern in a prison environment. Limiting the written materials an inmate can possess in his cell has a rational connection to this legitimate interest. Therefore, the first factor weighs decidedly in favor of Trotman and Dorgan.

Proceeding to the second Turner factor, plaintiff argues that alternative channels to exercise his right to free speech do not exist and that "the only alternative channel" is "to re-create new music, books, business plans, [and] screen plays." (Docket Entry # 252, p. 65). Defendants point out that Policy S403 allows inmates to possess written materials in their cells as long as the quantity does not exceed one cubic foot. (Docket Entry # 243, p. 10) (citing Docket Entry # 244-10). They also

---

confiscate and destroy plaintiff's property during the May 29, 2014 inventory in retaliation for plaintiff filing grievances. (Docket Entry # 252, pp. 15-16, 21-23, 28-29, 33-34, 45-46, 53, 58-59, 68, 77-78, 90-91).

maintain there is no evidence of a loss or destruction of the property.  (Docket Entry # 243, pp. 10-11).

Here again, the evidentiary quality materials that comprise the summary judgment record establish that Trotman and/or Dorgan did not destroy plaintiff's intellectual property and that alternative means existed for plaintiff to exercise his First Amendment right of expression.  Policy S403 does not restrict all written materials in plaintiff's cell.  Rather, it allows the possession in the cell of up to one cubic foot of writing materials, correspondence, and legal materials (Docket Entry # 244-10, p. 3, ¶ IV(C)(1)) thereby giving plaintiff an alternative means to write screenplays, formulate business plans, and write music lyrics.  Policy S422, in turn, allows plaintiff to possess a legal pad and pen in segregation thus affording him a similar opportunity.  (Docket Entry # 244-11, p. 5, ¶ V(B)(4)).  As the summary judgment target, plaintiff fails to sufficiently show he lacked these materials.  The foregoing alternative means set out in the regulations satisfy the second Turner factor.  See, e.g., Kuperman, 645 F.3d at 76 (alternative means to exercise religion set out in regulation "demonstrate that Kuperman had available to him alternative means to exercise his right to free expression of his religion"); see also Overton, 539 U.S. at 135 (alternatives "need not be ideal, however; they need only be available").

Plaintiff's argument that SCHOC did not leave open alternative channels because "the only alternative channel would be to re-create new music, books, business plans, and screen plays" (Docket Entry # 252, pp. 65-67) does not forestall summary judgment.  Plaintiff had the means to write other music, books, screenplays, and business plans with the allowable legal pad, writing materials, pen, and correspondence (Docket Entry # 244-10, p. 3, ¶ IV(C)(1)) (Docket Entry # 244-11, p. 5, ¶ V(B)(4)).  See Singer v. Raemisch, 593 F.3d 529, 539 (7th Cir. 2010) (confiscation of handwritten fantasy game manuscript and prohibition on possessing Dungeons and Dragons fantasy game and related material did not preclude inmate "from expressing himself by writing another work of fiction" or "possessing other reading material" thereby satisfying second Turner factor); see also Hudson v. Spencer, 2018 WL 2046094, at *3 ("'pertinent question'" regarding second factor "'is not whether plaintiffs have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates the opportunities to exercise their faith'") (internal citation omitted).  Like the first factor, the second factor weighs in Trotman and Dorgan's favor.

With respect to the third Turner factor and to the extent plaintiff challenges the one cubic foot limit, accommodating plaintiff's First Amendment right of expression would result in

78

plaintiff possessing in excess of the one cubic foot of writing materials in his cell.  The accommodations would logically increase the stated fire hazard in cells (Docket Entry # 244-10, pp. 1, 4, ¶¶ I(B)(1), V(A)(6)) creating a risk to other inmates. See Overton, 539 U.S. at 135 (noting, in conjunction with third factor, that "[a]ccommodating respondents' demands . . . would impair the ability of corrections officers to protect all who are inside a prison's walls").  Accordingly, in this respect, the third factor weighs in Trotman and Dorgan's favor.  To the extent plaintiff does not challenge the one cubic foot limit, the third factor is relatively neutral or favors plaintiff.

Turning to the fourth and final factor, the inquiry entails "whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal."  Overton, 539 U.S. at 136; Kuperman, 645 F.3d at 77 (quoting Overton, 539 U.S. at 136); see Turner, 482 U.S. at 91 (if inmate "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard").  "[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the [inmate's] constitutional complaint."  Turner, 482 U.S. at

90-91.  Moreover, the existence of other alternatives to the limits posed by the regulations upon possessing written materials, including legal paperwork, inside cells does not necessarily meet this high standard.  See Hudson v. Spencer, 2018 WL 2046094, at *3 ("existence of additional alternatives does not affect the balance, as the First Amendment does not require that plaintiffs be afforded their preferred alternatives"); see also Overton, 539 U.S. at 136.

Plaintiff does not offer a ready alternative designated as such.  Rather, he submits that Dorgan and Trotman had a duty to follow Sullivan's alleged order to bring all of plaintiff's legal property to him in segregation.  (Docket Entry # 252, pp. 67-68).  To the extent plaintiff suggests an alternative of being allowed to possess excess quantities of legal and intellectual property in his segregation or general population cell, this alternative would impose more than a de minimus increased risk of a fire hazard.  The fourth factor weighs in Trotman and Dorgan's favor.

Finally, insofar as plaintiff alleges that Trotman and Dorgan confiscated and destroyed the property for the purpose of causing plaintiff pain (Docket Entry # 100, ¶ 50), it is true that "confiscation of a prisoner's written work for no other reason than to cause emotional pain might support a First Amendment claim under" the Turner analysis.  Latimore v. Dep't

80

of Corr., 2013 WL 6181082, at *12.  Plaintiff nevertheless fails
to sufficiently show, via materials of evidentiary quality, that
the yellow legal pads, music lyrics and other items of his
intellectual property were confiscated or destroyed as opposed
to simply lost, misplaced, or not misplaced at all.  See id.
(dismissing First Amendment expression claim because "plaintiff
has failed to allege sufficient facts to show that his legal
pads were confiscated rather than lost or misplaced").

Overall, plaintiff fails to offer materials of evidentiary
quality that would dispute defendants' showing that SCHOC's
restrictive policy was reasonably related to the legislative
penological interest of avoiding the fire hazard posed by
excessive paper and materials in a cell.  Even if plaintiff's
property was destroyed, plaintiff had access to other materials
and the means to express himself through new works.  See
Overton, 539 U.S. at 135; Singer, 593 F.3d at 538-39.  Count II
is therefore subject to summary judgment.

IV.  Sixth Amendment Right to Counsel and Access to Courts
(Count III)

Count III alleges a section 1983 violation of plaintiff's
Sixth Amendment rights against Trotman, Dorgan, and Sullivan.[51]

---

[51]  Plaintiff maintains that Allen is liable in Count III.
(Docket Entry # 252, p. 37).  He is mistaken.  As previously
explained, the governing complaint (Docket Entry ## 100, 185)

Defendants move for summary judgment on the basis that Trotman, Dorgan, and Sullivan did not destroy plaintiff's legal materials and did not interfere with either plaintiff's right to counsel, or the interrelated right of access to the courts. (Docket Entry # 243, pp. 11-12, 14-15). With respect to the right to counsel claim, defendants argue they did not violate plaintiff's right to counsel because they did not unreasonably interfere with his ability to consult with counsel and they did not destroy his legal materials. (Docket Entry # 243, pp. 11-12). Regarding the right of access claim, defendants maintain that plaintiff did not suffer a loss of his legal work and he fails to show an actual injury. (Docket Entry # 243, pp. 14-15).

Plaintiff responds that the confiscation and destruction of his legal materials violated his Sixth Amendment right to counsel and he does not need to show an actual injury to establish a denial of his Sixth Amendment right to counsel because it is a direct constitutional right rather than a derivative right, such as the access to prison law libraries and legal assistance programs at issue in Lewis v. Casey, 518 U.S.

---

includes the statement of facts and claims that added Allen as a defendant (Docket Entry # 185). In filing the statement, this court instructed plaintiff to "identify[] the causes of action *in the existing complaint* that plaintiff seeks to bring against Sullivan and Allen." (Docket Entry # 174, p. 7) (emphasis in original). With respect to Count III, the statement only identifies Sullivan, *not* Allen. (Docket Entry # 185, p. 5).

343 (1996).  (Docket Entry # 252, pp. 38-39).  Plaintiff
additionally reasons he does not need to show an actual injury
under Lewis, 518 U.S. at 349, because he had the status of a
pretrial detainee inasmuch as he was defending against three,
open criminal prosecutions against him during the relevant time
period.  (Docket Entry # 252, pp. 38, 41-42).  Both arguments
rely heavily on Benjamin v. Fraser, 264 F.3d 175, 184-188 (2d
Cir. 2001), which plaintiff extensively quotes.  (Docket Entry #
252, pp. 37-43).

     Before proceeding to the analysis, it is worth outlining
the contours of Count III.  First and foremost, Count III raises
a denial of the right to counsel claim under the Sixth
Amendment.  (Docket Entry # 100, ¶ 54).  Plaintiff describes
"[t]he crux" of the claim as the confiscation and disposition of
his "legal materials," which deprived him of the research
"intended for his counsel to employ" to defend plaintiff in the
three criminal prosecutions.  (Docket Entry # 252, p. 38).
Plaintiff asserts he "had a protected constitutional right to
effective communication with his counsel, which includes the
right to furnish counsel with the complete research and
applicable law" to defend against these prosecutions.  (Docket
Entry # 252, p. 40).

     It is debatable whether Count III also raises a denial of
access to the courts claim even though defendants argue that

                               83

this claim is subject to summary judgment (Docket Entry # 243, pp. 14-15).  Plaintiff repeatedly distinguishes his right to counsel claim from a denial of access to courts claim on the basis that the latter requires an actual injury whereas the former does not.  (Docket Entry # 252, pp. 37-43).  Indeed, in opposing summary judgment, plaintiff states he "is not arguing that his right to access the courts has been violated, but that his Sixth Amendment right to counsel has been violated," and it is "the right to counsel in this claim and not the right to access the courts."  (Docket Entry # 252, pp. 39, 43).  Although plaintiff's opposition eschews the assertion of a denial of access to courts claim, Count III cites Bounds v. Smith, 430 U.S. 817, 828 (1977), *overruled on other grounds by* Lewis v. Casey, 518 U.S. 343, 354-55 (1996),[52] and asserts that "an absolute deprivation of access to all legal materials" obviates the need to plead an actual injury.  (Docket Entry # 100, ¶ 59).  Similarly, in opposing summary judgment, plaintiff argues that he "need not prove" the actual injury requirement.  (Docket Entry # 252, pp. 47-48).  Accordingly, out of an abundance of caution and because defendants seek to dismiss the claim (Docket

---

[52]  Bounds addressed an access to the courts claim and determined that prison authorities are required "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."  Bounds, 430 U.S. at 828.

Entry # 243, pp. 14-15), this court will address the access to courts claim even though it is debatable whether the complaint includes such a claim.  Thereafter, this court addresses the right to counsel claim.

A.  Access to Courts Claim

Turning to the access to courts claim, defendants argue it is deficient because plaintiff fails to show he suffered a loss of his legal materials or an actual injury.  (Docket Entry # 243, pp. 14-15).  They are correct on both fronts.

As to the first argument, the materials of evidentiary quality in the summary judgment record show that Sergeant Depina returned plaintiff's property to plaintiff on June 3, 2014, except for the W.B. Mason box of printed legal cases.[53]  (Docket Entry # 252-1, pp. 87, 92).  Thereafter, Misci delivered the copy box of legal materials to plaintiff in late June 2014, and on July 22, 2014, plaintiff received notice that the legal materials in the manila envelopes were in the law library.  (Docket Entry ## 244-12, 244-13) (Docket Entry # 244-22, ¶ 9(b)) (Docket Entry # 244-9, ¶ 10).  Throughout his incarceration at SCHOC, plaintiff's additional excess legal materials were stored in the law library, temporarily in the segregation property room, and/or stored by ILS and made available to plaintiff.

---

[53]  Depina also did not return assorted canteen items.  (Docket Entry # 252-1, pp. 87, 92).

(Docket Entry # 244-22, ¶¶ 8-9) (Docket Entry # 244, p. 9, ¶ 45) (Docket Entry ## 244-12, 244-13) (Docket Entry # 272, Ex. 13B, 13C).  This evidence, together with the affidavits by Sullivan, Dorgan, and Trotman that they did not destroy or confiscate plaintiff's personal property or legal materials (Docket Entry # 244-3, ¶ 11) (Docket Entry # 244-5, ¶ 5) (Docket Entry # 244-7, ¶ 6), establishes that: plaintiff received the W.B. Mason copy box of legal papers by late June 2014; had access to his other legal papers stored in the law library as of July 22, 2014; and the foregoing defendants did not destroy or confiscate plaintiff's property on May 29, 2014.  Accordingly, at most, plaintiff experienced a temporary loss of a portion of his legal materials.

With respect to defendants' second argument, inmates undeniably have a constitutional right of access to the courts. Boivin v. Black, 225 F.3d 36, 42 (1st Cir. 2000). "'[M]eaningful access to the courts is the touchstone.'" Lewis, 518 U.S. at 351 (internal citation omitted).  To establish a violation of the right of access to the courts, an inmate must "show actual injury." Boivin, 225 F.3d at 43 n.5 (citing Lewis, 518 U.S. at 349); accord Stile v. Cumberland County Sheriff, 2:14-cv-00406-JAW, 2018 WL 4688722, at *21 (D. Me. Sept. 28, 2018) ("prisoner's right to access the courts, however, requires a showing of actual injury to that right") (citing Lewis, 518

86

U.S. at 349).  There is no "abstract, freestanding right to a
law library or legal assistance, [and] an inmate cannot
establish [the] relevant actual injury simply by establishing
that his prison's law library or legal assistance program is
subpar in some theoretical sense."  Lewis, 518 U.S. at 351.
Rather, the inmate must "demonstrate that the alleged
shortcomings in the library or legal assistance program hindered
his efforts to pursue a legal claim."  Id.  The Supreme Court in
Lewis "defined" an "actual injury" as 'a nonfrivolous legal
claim being frustrated or impeded.'"  Boivin, 225 F.3d at 43 n.5
(quoting Lewis, 518 U.S. at 353) (internal ellipses and brackets
omitted).

Here, during the time period from the alleged confiscation
on May 29, 2014, until plaintiff's August 8, 2014 release from
SCHOC, plaintiff was able to file motions in ongoing criminal
proceedings, had access to the law library and the ILS program
(except for the limited time period in segregation), and had
counsel representing him in the ongoing criminal proceedings.
He also filed pro se motions, including to remove his counsel
and proceed pro se, during this time period in Massachusetts
Superior Court (Suffolk County) ("Massachusetts state court" or
"Massachusetts Superior Court").  (Docket Entry # 244-24, pp.
22-23) (Docket Entry # 244-25, p. 15).  Although he states he
had "a trial date set for June 23rd, 2014" and was unable to

"prepare motions in limine or suppression and dismiss motions"
(Docket Entry # 252-1, p. 87), what took place on June 23, 2014
in Massachusetts state court was plaintiff's filing of the pro
se motion to remove counsel and a pro se motion to preserve
evidence.   (Docket Entry # 244-24, p. 22).

The examples provided by the Court in Lewis of actual
injuries demonstrate that plaintiff's circumstances fall
decidedly short of creating a genuine issue of the requisite
injury.  See, e.g., Lewis, 518 U.S. at 351 (having a complaint
dismissed for technical reason because deficiencies of law
library prevented inmate from learning about the technical
requirement; inmate so stymied by inadequacies of law library
that he could not file a complaint).  In addition, district
court cases in the First Circuit involving allegations of denied
access to trial-related documents, denied access to necessary
legal materials, and temporary confiscation of legal materials
either dismiss such allegations under Fed. R. Civ. P. 12(b)(6)
or, alternatively, on summary judgment.  See Diaz v. Mass. Dep't
of Corr., Civil Action No. 16-11894-LTS, 2017 WL 3891664, at *1,
2-4 (D. Mass. July 26, 2017); Perry v. Spencer, Civil Action No.
12-12070-LTS, 2015 WL 628538, at *3 (D. Mass. Feb. 12, 2015);
Felton v. Lincoln, 429 F. Supp. 2d 226, 239-40 (D. Mass. 2006).
Accordingly, plaintiff fails to show a genuinely disputed issue
vis-à-vis actual injury as to the access to courts claim.

Moreover, the implication in the complaint that an "absolute deprivation of access to all [of plaintiff's] legal materials" satisfies the actual injury requirement (Docket Entry # 100, ¶ 60) is mistaken and, in any event, the summary judgment facts show that plaintiff does not fall within the reach of such an exception.  Justice Souter's opinion in <u>Lewis</u> cites a plethora of circuit court cases, including <u>Sowell</u>, 941 F.2d at 35, which dispense with the actual injury requirement in cases involving a "complete and systemic denial of all means of court access."  <u>Lewis</u>, 518 U.S. at 400 & n.2.  The majority opinion, however, rejects Justice Souter's suggestion to waive the "actual-injury requirement in cases involving . . . [a]n *absolute* deprivation of access to *all* legal materials" because it "rests upon the expansive understanding of *Bounds* that we have repudiated."  <u>Lewis</u>, 518 U.S. at 353 n.4 (ellipses added) (brackets in original) (internal citation and quotation marks omitted); see <u>Cowan v. Page</u>, Civil Action No. 5:16cv14, 2016 WL 4227885, at *3 (E.D. Tex. Aug. 11, 2016) ("[a]lthough Justice Souter argued inmates need only have a 'concrete grievance' in order to show actual injury, . . . Supreme Court majority rejected this view").

Quoting <u>Sowell</u>, 941 F.2d at 35 ("*absolute* denial of access to *all* legal materials, like an absolute denial of access to a law library or other basic form of legal assistance, might be

deemed inherently prejudicial" in access to courts claim)
(emphasis in original), a number of district courts in this
circuit nevertheless recognize a limited exception to the actual
injury requirement in access to courts claims in cases of
systemic and widespread lack of access.  See Perry v. Spencer,
2015 WL 628538, at *3 (citing Sowell, 941 F.2d at 34-35).
Specifically, "'[w]here the challenge is systemic, embracing the
basic adequacy of materials and legal assistance made available
to all or subgroups of the prison population' or 'the conditions
challenged obviously go the heart of any meaningful access to
libraries, counsel, or courts,' no actual injury may be needed."
Felton, 429 F. Supp. 2d at 240 n.7 (quoting Ferreira v. Duval,
887 F. Supp. 374, 381 (D. Mass. 1995) (quoting Sowell, 941 F.2d
at 34-35)).

Assuming arguendo that this principle survives Lewis, 518
U.S. at 351-353, the access to courts claim in the case at bar
does not fall within the reach of this exception.  First, as
explained above, the facts do not give rise to a genuine issue
that Trotman and Dorgan confiscated all of plaintiff's legal
materials or that Sullivan issued an order to Trotman and Dorgan
to deliver all of plaintiff's legal materials to plaintiff in
segregation, which Trotman and Dorgan then failed to follow.
Rather, the record shows that Sergeant Depina returned all of
plaintiff's property inventoried on May 29 to plaintiff on June

3, 2014, except for the W.B. Mason box of printed legal cases
and the bag of manila envelopes with legal paperwork; Misci
thereafter delivered the copy box of legal materials to
plaintiff in late June 2014; and on July 22, 2014, plaintiff
received notice that legal materials in the manila envelopes
were in the law library.  Second, plaintiff had some legal
materials in segregation, and, in late 2013 and in 2014,
plaintiff had access to the law library and was represented by
counsel in ongoing criminal proceedings (Docket Entry # 244-24,
pp. 20, 22) (Docket Entry # 244-25, pp. 13-15)[54] thus belying any
systemic and widespread condition that would dispense with the
actual injury requirement.  See Felton, 429 F. Supp. 2d at 240
n.7; see also Diaz v. Mass. Dep't of Corr., 2017 WL 3891664, at
*3 (citing First Circuit case as "holding that a Massachusetts
state prisoner confined in a Kansas prison was not denied access
to the courts, despite his lack of access to Massachusetts legal
materials, because he had access to a law school clinical
program").

B.  Right to Counsel Claim

---

[54] "During relevant time periods, [plaintiff] had three pending
criminal matters in Suffolk Superior Court: 1384 CR 10977" ("CR
10977"); 1384 CR 11140 ("CR 11140"); and 1484 CR 11124 ("CR
11124").  (Docket Entry # 244, p. 9, ¶ 47) (Docket Entry ## 244-
24 to 244-26) (Docket Entry # 252-1, pp. 87, 92).

Turning to the right to counsel claim, this court will assume, for purposes of argument only, that a showing of an actual injury is not required in the context of this case.[55] Plaintiff presents the claim as based on the right-to-counsel law in Benjamin, 264 F.3d at 185-186, applies (Docket Entry # 252, pp. 37-43). In addition, both plaintiff and defendants concur that, "in the context of the right to counsel, unreasonable interference with the accused person's ability to consult counsel is itself an impairment of the right." Id. at 185; (Docket Entry # 243, p. 11); (Docket Entry # 252, p. 40); see generally Thore v. Howe, 466 F.3d 173, 181 n.1 (1st Cir. 2006).

As previously noted, defendants argue that Trotman, Dorgan, and Sullivan did not violate plaintiff's right to counsel

---

[55] The assumption that an actual injury is not required is made dubitante because the actual injury requirement "derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." Lewis, 518 U.S. at 349. Prejudice is also required in other right to counsel claims, such as when the government intrudes upon an inmate defendant's confidential communications with his counsel. See Palermo v. Wrenn, Civil No. 11-cv-337-JL, 2012 WL 405493, at *4-5 (D.N.H. Feb. 8, 2012); see also United States v. Mastroianni, 749 F.2d 900, 907-908 (1st Cir. 1984).

Separately, this court is not convinced by plaintiff's argument that he has the status of a pretrial detainee. Rather, as he forthrightly acknowledges, he was "serving a sentence at SCHOC" prior to his August 8, 2014 release. (Docket Entry # 252, p. 39). Irrespective of plaintiff's status, summary judgment remains appropriate.

because they did not interfere with plaintiff's ability to consult with his attorney.  (Docket Entry # 243, pp. 11-12). They point out that "[w]ell before the May 29, 2014 properly incident, [plaintiff] was represented by defense counsel on two criminal matters."  (Docket Entry # 243, p. 11).  They further maintain they "did not destroy his legal materials."  (Docket Entry # 243, p. 11).  Turning to Benjamin in light of plaintiff's reliance on the case to present the right to counsel claim, the court determined that when an inmate raises a denial of the right to counsel based on impeding his ability to visit and meaningfully consult with his attorney representing him in an ongoing criminal proceeding, the right to counsel is impaired when there is an "unreasonable interference with [his] ability to consult [with] counsel."  Benjamin, 264 F.3d at 185; accord O'Mara v. Hillsborough Cnty Dep't of Corr., No. 08-cv-51-SM, 2008 WL 5077001, at *8 (D.N.H. Nov. 24, 2008) ("'[I]n the context of the right to counsel, unreasonable interference with the accused person's ability to consult counsel is itself an impairment of the right.'") (quoting Benjamin, 264 F.3d at 185). The issue therefore reduces to whether a genuinely disputed fact exists that Sullivan, Trotman, and/or Dorgan unreasonably interfered with plaintiff's ability to consult with his counsel in one of more pending criminal prosecutions.

Plaintiff maintains these defendants interfered with his right to effectively communicate with his attorney by confiscating, destroying, or losing all of his legal materials thereby denying him "the right to furnish counsel with the complete research and applicable law related to his defenses." (Docket Entry # 252, p. 40).  First, the summary judgment record fails to establish a genuinely disputed fact that these defendants confiscated or destroyed plaintiff's legal materials. Rather, plaintiff experienced a temporary loss of a portion of his legal papers, namely, the copy box of legal papers and the manila folders with legal materials.  During this time period, there is no indication that plaintiff sought to consult with his then-appointed attorney in CR 10977 or CR 11140.  Contrary to plaintiff's argument (Docket Entry # 252, pp. 42-43), the summary judgment record does not evidence that Sullivan ordered Dorgan to deliver all of plaintiff's legal property to plaintiff in segregation or that Dorgan did not adhere to any such purported order.  Likewise, and again contrary to plaintiff's argument (Docket Entry # 252, pp. 45-46), the summary judgment record fails to evidence that Sullivan ordered Dorgan or Trotman to confiscate or destroy plaintiff's legal property.

Second, in December 2013, the Massachusetts Superior Court appointed counsel to represent plaintiff in CR 10977 (Docket Entry # 244-24, p. 20) and CR 11140 (Docket Entry # 244-25, p.

94

13).  On May 19, 2014, plaintiff attended court proceedings in these cases, during which the court allowed the withdrawal of plaintiff's appointed counsel and appointed a different attorney to represent plaintiff.  (Docket Entry # 244-24, p. 22) (Docket Entry # 244-25, pp. 14-15).  In June 2014, the attorney in CR 10977 filed a motion to withdraw, and plaintiff filed a pro se motion to remove him and proceed pro se.  (Docket Entry # 244-24, p. 22).  In July 2014, the attorney in CR 11140 filed a motion to withdraw, and plaintiff filed a pro se motion to remove him and proceed pro se (Docket Entry # 244-25, p. 15).  The court did not immediately act on either motion.  (Docket Entry # 244-24, p. 22).  On July 31, 2014, plaintiff again attended court proceedings in CR 10977 and CR 11140, during which the court allowed the motion to withdraw and appointed another attorney to represent plaintiff.  (Docket Entry # 244-24, pp. 20, 22-23) (Docket Entry # 244-25, p. 15).  Plaintiff fails to demonstrate that by this time (July 31, 2014) he did not have access to the missing legal materials.  Notably, there is no showing that Sullivan, Trotman, and/or Dorgan interfered with plaintiff's opportunity to consult with these attorneys in these court proceedings.  See Leniart v. Murphy, Civ. No. 3:11CV01635(SALM), 2016 WL 1273166, at *1, 4-5, 7-9 (D. Conn. Mar. 31, 2016) (inmate's difficulty in remembering items to discuss with counsel because of theft of inmate's handwritten

legal notes did not violate Sixth Amendment right to counsel) (allowing summary judgment and citing, inter alia, Benjamin, 264 F.3d at 185-86).

After plaintiff's August 8, 2014 release from SCHOC, plaintiff attended court proceedings on August 14, 2014 in CR 10977 and CR 11140. (Docket Entry # 244-24, p. 23) (Docket Entry # 244-25, p. 15). During these proceedings, the court ordered his current counsel to serve as stand-by counsel and allowed plaintiff to proceed pro se. (Docket Entry # 244-24, p. 23) (Docket Entry # 244-25, p. 15). Although plaintiff states by affidavit that the confiscation and destruction of the W.B. Mason box of legal cases made him unable to prepare motions in limine and/or a motion to suppress in the context of a June 24, 2014 trial date (Docket Entry # 252-1, p. 87), there was no such trial date, as previously explained, and plaintiff filed the motions to suppress with affidavits in January 2015 when he had stand-by counsel. (Docket Entry # 244-24, pp. 24-26) (Docket Entry # 244-25, pp. 16-17). Moreover, stand-by counsel attended court proceedings between August 2014 and January 2015, during which plaintiff had the opportunity to discuss the preparation of motions in limine at a time when he had his legal materials or, more specifically, at a time when the materials of evidentiary quality fail to show a genuinely disputed fact that plaintiff lacked these materials.

Plaintiff also utilized ILS after his release from segregation.  He acknowledges he worked with an attorney at ILS and that an ILS paralegal was trying to help him.  (Docket Entry # 244-15, pp. 17-19, 21-22) (Docket Entry # 244-22, ¶ 6).  More broadly, the temporary loss of a portion of plaintiff's legal materials purportedly on the part Sullivan, Trotman, and/or Dorgan does not create a genuinely disputed fact rising to the level of an unreasonable interference with plaintiff's right to consult with his counsel.  See Leniart, 2016 WL 1273166, at *1, 4-5, 7-9; accord Benjamin, 264 F.3d at 185-86.  With respect to the right to counsel claim, defendants are therefore correct that Sullivan, Trotman, and/or Dorgan did not violate plaintiff's right to counsel or unreasonably interfere with plaintiff's right to counsel in a manner sufficient to avoid summary judgment.[56]  Count III is therefore subject to summary judgment.

V.  Due Process Claims (Counts IV and VII)

---

[56]  For reasons previously explained, Policy S403 does not contravene Turner, 482 U.S. at 89-91.  See, e.g., United States v. Trabelsi, Criminal Action No. 06-89 (RDM), 2019 WL 3536611, at *3-4 (D.D.C. Aug. 2, 2019) (applying Turner analysis in the context of denying inmate's Sixth Amendment right to counsel claim); see also Dupont v. Dubois, No. 96-1459, 1996 WL 649340, at *4 (1st Cir. Nov. 6, 1996) (rejecting inmate's complaint regarding defendants' seizure of legal materials from inmate's cell in excess of one cubic foot under prison's policy and noting that seizures did not "cause[] any actual injury to his right of court access") (unpublished).

A.  <u>Count IV</u>

Count IV alleges a procedural due process claim against Trotman, Dorgan, and Barrows.[57]  (Docket Entry # 100, ¶¶ 62-67).  Defendants' argument regarding the procedural due process claim is twofold.  First, defendants assert that plaintiff fails to establish that Trotman, Dorgan, and Barrows deprived him of his property.  Second, even if these defendants deprived plaintiff of his property, a meaningful postdeprivation remedy was available.  (Docket Entry # 243, pp. 12-13).

Relying on <u>Logan v. Zimmerman Brush Co.</u>, 455 U.S. 422 (1982), plaintiff argues that the confiscation and destruction was foreseeable and postdeprivation remedies therefore inadequate.  (Docket Entry # 252, pp. 8-9, 12, 15).  He maintains that "state officials learned or knew in advance" about the "possible confiscation and disposal" of his legal materials because he informed them about the danger.  (Docket Entry # 252, p. 12).  Plaintiff's affidavits reflect that, once he was in segregation, he told an unidentified SCHOC sergeant to call Barrows and instruct her to oversee the inventory or assign

---

[57]  Plaintiff maintains that Sullivan and Allen are also liable under Count IV.  (Docket Entry # 252, pp. 12, 14-17).  The governing complaint and, more specifically, the short statement of facts and claims regarding the amendment to include Sullivan and Allen as defendants, does not name these defendants in Count IV.  (Docket Entry # 185, p. 5).  Count IV therefore does not include Sullivan and Allen as defendants.  (Docket Entry # 185, p. 5).

a corrections officer "besides" Sullivan and Allen.  (Docket
Entry # 252-1, pp. 87, 91).  Citing <u>Mathews v. Eldridge</u>, 424
U.S. 319 (1976), and other cases, plaintiff additionally argues
that Sullivan exercised discretionary authority when she ordered
Trotman and Dorgan to deliver all of plaintiff's legal property
to plaintiff in segregation and that Trotman and Dorgan had an
absolute duty to comply with her order.  (Docket Entry # 252,
pp. 10-11).  Alternatively, plaintiff asks this court to draw
the inference that, instead of giving this order, Sullivan[58]
along with Barrows conspired to destroy plaintiff's property
because they knew about "plaintiff[']s prior grievance and
disciplinary history" and Sullivan therefore ordered Trotman and
Dorgan to destroy plaintiff's property in retaliation for
plaintiff "seeking redress of grievances."  (Docket Entry # 252,
pp. 14-16).

Turning to defendants' second argument, to succeed in a
section 1983 procedural due process claim, the plaintiff must
show: (1) the existence of a constitutionally protected
"'liberty or property interest . . . interfered with by the
State'"; and (2) "'the procedures attendant upon that
deprivation were constitutionally'" inadequate.  <u>González-
Fuentes v. Molina</u>, 607 F.3d 864, 886 (1st Cir. 2010) (internal

---

[58]  As stated in the previous footnote, Sullivan is not named as
a defendant in Count IV.

citation omitted).  Defendants maintain that the Parratt-Hudson
doctrine applies (Docket Entry # 243, pp. 12-13) whereas
plaintiff contends that Logan applies and that the factors in
Mathews lead to the conclusion that a postdeprivation remedy is
inadequate and summary judgment inappropriate (Docket Entry #
252, pp. 8-17).

In Parratt, a state inmate alleged a denial of procedural
due process because a state prison guard negligently lost the
inmate's hobby kit.  Parratt v. Taylor, 451 U.S. 527, 530-31
(1981), *overruled in part on other grounds*, Daniels v. Williams,
474 U.S. 327 (1986); see San Gerónimo Caribe Project, Inc. v.
Acevedo-Vilá, 687 F.3d 465, 478 n.11 (1st Cir. 2012).  "The
Court held that no predeprivation process was required where
[the] state prison guard *negligently* destroyed [the] prisoner's
property, so long as adequate postdeprivation remedies were
available."  San Gerónimo, 687 F.3d 465, 478 (1st Cir. 2012).
The Court explained that the loss was not the result of an
"'established state procedure and the State [could] not predict
precisely when the loss [would] occur.'"  Id. at 479 (quoting
Parratt, 451 U.S. at 541); accord Zinermon v. Burch, 494 U.S.
113, 129 (1990) (also quoting Parratt, 451 U.S. at 541).  "The
very nature of a negligent loss of property" by a state prison
guard acting in a random and unauthorized fashion "made it

impossible for the State to predict" the loss "and provide predeprivation process."  Zinermon, 494 U.S. at 129.

The Court in Hudson v. Palmer extended the reasoning in Parratt to an intentional destruction of an inmate's "property by a state prison guard, explaining that 'when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply "impracticable" since the state cannot know when such deprivations will occur.'"  San Gerónimo, 687 F.3d at 479 (quoting Hudson v. Palmer, 468 U.S. at 533); accord Zinermon, 494 U.S. at 129-130.  "Whether the state employee knew in advance of the deprivation was irrelevant; instead '[t]he controlling inquiry is solely whether the state is in a position to provide for predeprivation process.'"  San Gerónimo, 687 F.3d at 479 (quoting Hudson v. Palmer, 468 U.S. at 534).  In both Parratt and Hudson v. Palmer, the state prison guard "was not acting pursuant to any established state procedure, but, instead, was" acting in a random and unauthorized manner against the prisoner.  Zinermon, 494 U.S. at 130.

Here too, whether the loss was intentional or a mistake on the part of an SCHOC employee in failing to adhere to Policy S403 and/or Policy S244 and deposit the W.B. Mason box of legal papers in the correct location, the fact remains that a predeprivation procedure was impracticable and predeprivation

safeguards of no use or value.  As to a negligent loss, "it 'borders on the absurd to suggest that a State must provide a hearing to determine whether or not a corrections officer should engage in negligent conduct.'"  Zinermon, 494 U.S. at 137 (internal citation omitted).  The fact that plaintiff explained to an unidentified sergeant that the sergeant needed to call Barrows "and instruct her to oversee or assign a CO to inventory [plaintiff's] cell besides Sgt. Sullivan and CO Allen" (Docket Entry # 252-1, p. 87) does not imply that SCHOC can "predict precisely when the loss will occur," San Gerónimo, 687 F.3d at 479 (emphasis added), or render it practicable to engage in a predeprivation procedure at that time.  As to an intentional destruction or confiscation of the box of legal materials, an SCHOC "rule forbidding" staff "to maliciously destroy a prisoner's property would not have done any good."  Zinermon, 494 U.S. 137; id. at 130 ("'state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct'") (quoting Hudson v. Palmer, 468 U.S. at 533).

With respect to plaintiff's argument that the Mathews factors control, it is true that Parratt is not an exception to the Mathews test.  See id. at 129 ("Parratt is not an exception to the Mathews balancing test").  Rather, Parratt presents:

> the unusual case in which one of the variables in the
> *Mathews* equation—the value of predeprivation safeguards—is
> negligible in preventing the kind of deprivation at issue.
> Therefore, no matter how significant the private interest
> at stake and the risk of its erroneous deprivation, see
> *Mathews*, 424 U.S., at 335, 96 S.Ct., at 903, the State
> cannot be required constitutionally to do the impossible by
> providing predeprivation process.

Zinermon, 494 U.S. at 129.[59]  The same principle applies to the

intentional deprivation of property.  As elucidated in Zinermon,

both "*Parratt* and *Hudson* represent a special case of the general

*Mathews v. Eldridge* analysis, in which postdeprivation tort

remedies are all the process that is due, simply because they

are the only remedies the State could be expected to provide."

Id. at 128.

Examining the three reasons the Zinermon Court used to deem

the Parratt-Hudson doctrine inapplicable confirms that

postdeprivations remedies, consisting of a state-law tort claim

---

[59]  The First Circuit summarizes the Mathews three-part test as
follows:

> Determining the sufficiency of process in a particular
> situation requires application of the Mathews v. Eldridge
> balancing test, which weighs three factors: (1) the private
> interest affected by the government action; (2) "'the risk
> of an erroneous deprivation of such interest through the
> procedures used, and the probable value, if any, of
> additional or substitute procedural safeguards'"; and (3)
> the state's interest, "'including the function involved and
> the fiscal and administrative burdens that the additional
> or substitute procedural requirement would entail.'"

Perry v. Spencer, 751 F. App'x 7, 11 (1st Cir. Aug. 29, 2018)
(quoting Wilkinson v. Austin, 545 U.S. 209, 224-25 (2005))
(quoting Mathews, 424 U.S. at 335)) (unpublished).

for conversion or SCHOC's internal grievance process, "are all
the process that is due."  Id.  The first reason is that "the
risk of deprivation of liberty was predictable and was so as to
the particular point . . . when the deprivation would occur."
San Gerónimo, 687 F.3d at 480 (citing Zinermon, 494 U.S. at
136).  Here, plaintiff's warning to the unidentified sergeant to
tell Barrows to oversee the inventory or assign a corrections
officer to inventory the property does not make the risk of a
negligent loss or an intentional destruction of the property
predictable at a precise or particular point during the
inventory and storage process.  Under the circumstances, the
particular point when the loss or destruction of plaintiff's
property would occur was neither predictable nor foreseeable.
See id. (citing Zinermon, 494 U.S. at 133).  Similarly, although
in Parratt:

> [the State] could anticipate that prison employees would
> occasionally lose property through negligence, it certainly
> "cannot predict precisely when the loss will occur."  451
> U.S. at 541, 101 S.Ct., at 1916.  Likewise, in *Hudson*, the
> State might be able to predict that guards occasionally
> will harass or persecute prisoners they dislike, but cannot
> "know when such deprivations will occur."  468 U.S., at
> 533, 104 S.Ct., at 3203.

Zinermon, 494 U.S. at 136.

The second reason is that a predeprivation process was not
impossible.  Id. at 136-37.  In contrast, "the very nature of
the deprivation" at issue in Parratt, namely, the negligent loss

104

of the inmate's hobby kit, "made predeprivation process 'impossible'" because it was absurd to convene a hearing to determine if the prison employee would act in a negligent manner, and, with respect to intentional conduct, the State "could not anticipate or control [the] random and unauthorized intentional conduct" of a prison employee.  Id. at 137. Likewise, as discussed above, SCHOC could not anticipate or control random and unauthorized conduct given the nature of the purported negligent misplacement or intentional destruction.

The third reason examines whether the conduct is "'unauthorized' in the sense the term is used in *Parratt* and *Hudson*."  Id. at 138.  When the State delegates broad authority to prison employees to effectuate the deprivation, it also delegates the authority to effect predeprivation procedural safeguards to guard against the deprivation.  See id.; see also San Gerónimo, 687 F.3d at 480; Gonzalez v. Dooling, 98 F. Supp. 3d 135, 143 (D. Mass. 2015) ("third consideration can also be characterized as an inquiry into the scope of discretion conferred on the state actor") (citing San Gerónimo, 687 F.3d at 482).  In the case at bar, SCHOC did not delegate broad authority to prison employees to carry out the inventory and storage process.  Rather, the policies dictate a specific and discrete process that takes place when an inmate is removed from his cell and placed in disciplinary detention.  Policy S403

requires two officers "to inventory, package and move all of the inmate's property" under a step-by-step procedure. (Docket Entry # 244-10, ¶ V(F)). The officers must secure the property, inventory each item on a prescribed form, and arrange for the removal with the area supervisor. (Docket Entry # 244-10, ¶ V(F)). Policy S422 lists the exact items that inmates in the disciplinary segregation unit are allowed to have while housed in segregation[60] and thereby limits the discretion of a prison employee to transport only those items to disciplinary segregation unit inmates after an inventory. (Docket Entry # 244-11, ¶ V(B)) (Docket Entry # 244-9, ¶ 8). These policies leave little room for the exercise of discretion on the part of the prison employees conducting the inventory and storage. The employees therefore lacked the broad authority and discretion to deprive prisoners of their property and the concomitant duty to initiate procedural safeguards.

Finally, multiple decisions by district courts in the First Circuit apply the Parratt-Hudson doctrine to lost or stolen inmate property and conclude that sufficient due process is afforded by an adequate postdeprivation remedy in the form of a state law claim for conversion or administrative remedies. Simpson v. Superintendent, Merrimack Cnty. Dep't of Corr., Civil

---

[60]  Items include one shower bag, six pairs of socks, and one towel. (Docket Entry # 244-11, ¶ V(B)).

No. 13-cv-549-JD, 2014 WL 1404568, at *1, 3 (D.N.H. Apr. 10, 2014) (rejecting due process claim by inmate alleging prison employees took his legal papers and threw them in trash during period when he was moved to administrative segregation because inmate had adequate postdeprivation remedy, i.e., state law conversion claim); Tolbert v. Clarke, Civil Action No. 10-11643-RWZ, 2011 WL 2530975, at *3 (D. Mass. June 21, 2011) ("In the case of lost or stolen property, sufficient due process is afforded an inmate if he has access to an adequate post-deprivation remedy."); O'Mara, 2008 WL 5077001, at *11 (dismissing due process claim alleging confiscation of inmate's property consisting of correspondence and writing paper because intentional deprivation does not violate due process if meaningful postdeprivation remedy is available); Lepine v. Brodeur, No. CV 97-72-M, 1999 WL 814277, at *16 (D.N.H. Sept. 30, 1999) (denying due process claim alleging lost or stolen mail order catalogues because "inmates can pursue available post-deprivation administrative remedies"). Accordingly, Count IV is subject to summary judgment.[61]

Count VII raises a corresponding claim that Barrows and Sullivan are liable for their failure to supervise the

---

[61] It is therefore not necessary to address defendants' first argument.

inventory.[62]  Defendants seek summary judgment on this claim

because the subordinate employees did not commit a

constitutional violation of plaintiff's right to due process,

and there is no evidence of an affirmative link between their

conduct and the actions of Barrows and/or Sullivan.  (Docket

Entry # 243, pp. 19-21).  Plaintiff argues that Barrows and

Sullivan "failed to supervise their subordinates with deliberate

indifference amounting to gross negligence."  (Docket Entry #

252, p. 55).

Supervisory liability "under section 1983 has two

elements."  Parker v. Landry, 935 F.3d 9, 14 (1st Cir. 2019).

First, there must be a showing "that 'one of the supervisor's

subordinates abridged the plaintiff's constitutional rights.'"

Id. (quoting Guadalupe-Báez v. Pesquera, 819 F.3d 509, 514 (1st

Cir. 2016)) (additional citations omitted); Guadalupe-Báez, 819

F.3d at 514 ("plaintiff must show that one of the supervisor's

subordinates abridged the plaintiff's constitutional rights").

Second, there must be "an affirmative link between the

abridgement and some action or inaction on the supervisor's

---

[62]  To the extent plaintiff maintains that defendants other than
Barrows and Sullivan are liable under Count VII, the governing
complaint names only Barrows (Docket Entry # 100, ¶¶ 81-86)
(Docket Entry # 157, pp. 2-3) and Sullivan (Docket Entry # 185,
p. 5) as defendants.

part."  Parker v. Landry, 935 F.3d at 14 (internal citations omitted).

First and foremost, Count VII is deficient because the conduct of Trotman, Dorgan, and Barrows did not constitute a constitutional violation of plaintiff's right to procedural due process as previously discussed.  Allen did not violate plaintiff's right to due process because he did not participate in the inventory of plaintiff's property and, instead, "focused on completing [the] reports."  (Docket Entry # 244-4, ¶ 5).  In addition, as to all four defendants, the existence of available postdeprivation remedies satisfies due process.  Accordingly, defendants are correct that the first element of a supervisory liability claim, a subordinate's constitutional violation, is absent.  It is therefore not necessary to examine the remaining arguments relative to Count VII.  Neither Barrows nor Sullivan incur supervisory liability in Count VII.  See McInnis v. Me., 638 F.3d 18, 22 n.4 (1st Cir. 2011) ("[b]ecause there was probable cause for the officers at the scene to arrest, . . ., there is no basis for liability" of supervisors); Perry v. Dickhaut, 125 F. Supp. 3d 285, 299 (D. Mass. 2015) (given absence of "underlying conduct that was 'itself violative of a plaintiff's constitutional rights,' the assertion that the supervisors are also liable fails").  Count VII, like the

underlying due process claim in Count IV, is subject to summary judgment.

VI.   <u>MCRA Claim (Count V)</u>

Count V sets out MCRA violations against Sullivan and Allen based on the May 29, 2014 incident and against Libby based on the August 7, 2014 cell search.  (Docket Entry # 100, ¶¶ 68-73) (Docket Entry # 185, p. 5) (Docket Entry # 157, p. 28).[63]  With respect to the May 29 incident, defendants seek summary judgment because plaintiff fails to show "a prima facie case" of an MCRA violation as to Sullivan and Allen.  (Docket Entry # 243, pp. 15-16).  In particular, they submit that plaintiff fails to establish material facts which show an interference or attempted interference with plaintiff's "exercise or enjoyment of rights guaranteed by the Massachusetts or United States constitution." (Docket Entry # 243, p. 15).  They also maintain that neither Sullivan nor Allen's conduct on May 29, 2014 involved threats, intimidation or coercion.  (Docket Entry # 243, pp. 15-16). Regarding the latter, they point to the absence of evidence that "Sullivan or Allen placed [plaintiff] in fear, threatened or coerced him in order to interfere with his rights" and accurately note that plaintiff was not even present when the collection and inventory took place.  (Docket Entry # 243, p.

---

[63]  See n.6.

16).  As to the August 7, 2014 incident, defendants similarly argue that Libby's conduct and statements during the cell search did not rise to the level of threats, intimidation, or coercion. (Docket Entry # 243, pp. 17-18).

Plaintiff disagrees and contends that Sullivan and Allen used threats, intimidation, and coercion to prevent him from exercising his right to file "institutional grievances against the defendants" and exercise his First Amendment right to be free from retaliation and their "selective code enforcement." (Docket Entry # 252, pp. 70-71).  Moreover, their conduct was not limited to the confiscation and seizure of plaintiff's legal materials, music, and business plans on May 29, according to plaintiff.  Rather, plaintiff submits their "selective code enforcement" accompanied by threats, intimidation, and coercion took place in April and May prior to the May 29, 2014 inventory and storage of his property.  (Docket Entry # 252, pp. 70-81). Citing the governing complaint, plaintiff argues that Libby's conduct of throwing plaintiff's legal materials around the cell, "clearing his entire bunk," and Libby's larger size and weight than plaintiff's size and weight placed plaintiff "in imminent fear" of an assault or battery, engendered a "reasonable apprehension of bodily harm," and "could be considered threatening, intimidating or coercive to a normal reasonable person."  (Docket Entry # 252, pp. 80-81) (emphasis omitted).

111

The MCRA constitutes "a state-law analogue to 42 U.S.C. § 1983 that provides a statutory civil cause of action against those who 'interfere' with the exercise or enjoyment of rights secured by federal or state law." Nolan v. CN8, the Comcast Network, 656 F.3d 71, 76 (1st Cir. 2011). Although the statute reaches private conduct, it is narrower that section 1983 because it requires "conduct that interferes with a secured right 'by threats, intimidation or coercion.'" Id. (quoting Mass. Gen. Laws ch. 12, § 11H). "[I]n order to prevent" the creation of "a 'vast constitutional tort,'" the Massachusetts "Legislature 'explicitly limited the [statute's] remedy to situations where the derogation of secured rights occurs by threats, intimidation or coercion.'" Glovsky v. Roche Bros. Supermarkets, Inc., 17 N.E.3d 1026, 1035 (Mass. 2014) (citations omitted). Hence, "'the derogation of secured rights must occur by threats, intimidation or coercion.'" Felix v. Donnelly, Civil Action No. 12-10997-IT, 2017 WL 2261127, at *7 (D. Mass. Mar. 28, 2017) (internal citation omitted); see Sheffield v. Pieroway, 361 F. Supp. 3d 160, 168 (D. Mass. 2019) (to prevail under MCRA, plaintiff must demonstrate "defendant engaged in the use of threats, intimidation or coercion"), appeal dismissed sub nom., Sheffield v. City of Bos., No. 19-2137, 2019 WL 8750044 (1st Cir. Dec. 9, 2019); see, e.g., Brum v. Town of Dartmouth, 704 N.E.2d 1147, 1162 (Mass. 1999) (affirming dismissal because

complaint failed to allege threats, intimidation, or coercion) (internal citations omitted).  Overall, the plaintiff "'must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) that the interference was by threats, intimidation or coercion.'"  Glovsky, 17 N.E.3d at 1035 (internal citation omitted); Am. Lithuanian Naturalization Club, Athol, Mass., Inc. v. Bd. of Health of Athol, 844 N.E.2d 231, 244 (Mass. 2006); accord Croteau v. MiTek Inc., Civil Action No. 19-12171-ADB, 2020 WL 4673532, at *5 (D. Mass. Aug. 12, 2020) (stating same requirements).

Under the MCRA, "a 'threat' consists of 'the intentional exertion of pressure to make another fearful or apprehensive of injury or harm'; 'intimidation' involves 'putting in fear for the purpose of compelling or deterring conduct'; and 'coercion' is 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.'"  Glovsky, 17 N.E.3d at 1035 (internal citations omitted); see Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 990 (Mass. 1994) (setting out same definitions).  The standard to determine "whether conduct constitutes threats, intimidation or coercion is an objective, reasonable person standard." Kappa Alpha Theta Fraternity, Inc. v. Harvard Univ., 397 F. Supp. 3d 97, 109 (D.

Mass. 2019) (citing Currier v. Nat'l Bd. of Med. Exam'rs, 965 N.E.2d 829, 838 (Mass. 2012)); see Haufler v. Zotos, 845 N.E.2d 322, 335 (Mass. 2006) (using "reasonable person standard to determine whether Zotos's conduct constituted threats, intimidation, or coercion under the act"); Planned Parenthood, 631 N.E.2d at 990 (lower court "*correctly* applied the objective standard of whether a reasonable woman . . . would be threatened, intimidated, or coerced by the defendants' conduct") (emphasis added).

Turning to the May 29, 2014 incident, defendants maintain that neither Sullivan nor Allen engaged in any threats, intimidation, or coercion.  For purposes of argument, this court assumes that plaintiff correctly includes the conduct by Sullivan and Allen that took place in April and May prior to the May 29th incident and will consider this conduct as a basis for finding they engaged in threats, intimidation, or coercion.  In fact, "[a]n MCRA claim is often based on multiple or repeated acts that if taken individually would be insufficient to make out the claim but if taken collectively are sufficient to constitute threats, intimidation, or coercion."  Reichenbach v. Haydock, 90 N.E.3d 791, 798 (Mass. App. Ct. 2017) (collecting authority).  In the context of a prison environment, however, neither Sullivan's nor Allen's conduct during this time period would give rise to a reasonable person being threatened,

114

intimidated, or coerced.  A reasonable person under the
circumstances of the prison environment would not be threatened,
intimidated, or coerced to forgo filing grievances by Sullivan's
slamming a cell door and "yelling and pointing" at plaintiff
(Docket Entry # 252-1, p. 6); Allen ordering plaintiff to "lock
in" on May 25 (Docket Entry # 252-1, p. 86); Sullivan's warning
that plaintiff would "be receiving a disciplinary report"
(Docket Entry # 252-1, p. 5), see Fed. R. Evid. 801(d)(2); the
filing of disciplinary reports, all of which resulted in guilty
findings on at least one offense charged in each report; and
receiving punishments for committing such offenses consisting of
the two-week loss of canteen privileges, 48 hours of restricted
movement, and less than a week of time served in segregation
with three days suspended.  A reasonable inmate would also not
feel threatened, intimidated, or coerced by the fact that
Sullivan and Allen were assigned to inventory the property on
May 29th and defendants correctly point out that plaintiff was
not present during the collection, inventory, and storage of the
property.  Defendants also correctly point out (Docket Entry #
243, p. 16) that plaintiff fails to meet his underlying burden
to show that Sullivan and/or Allen engaged in threatening,
intimidating, or coercive conduct in order to "'cause the
plaintiff to give up something that he has the constitutional
right to do.'"  Thomas v. Harrington, 909 F.3d 483, 492 (1st

Cir. 2018) (quoting <u>Goddard v. Kelley</u>, 629 F. Supp. 2d 115, 128
(D. Mass. 2009)).

Similarly, a reasonable person in plaintiff's
circumstances, namely, an inmate about to be released from
prison and being subject to a cell search, would not consider
Libby's actions on August 7, 2014 as threats, intimidation, or
coercion.  In the course of conducting a cell search, which is
commonplace in prison, Libby ransacked plaintiff's legal
materials and told plaintiff to throw away the trash in the
context of also asking him if he were pro se.  It is a fact of
prison life that prison officials routinely engage in cell
searches and the statements fall substantially short of threats,
intimidation, or coercion.  <u>See</u> <u>Muldoon v. Dep't of Corr.</u>, Civil
Action No. 15-13892-DJC, 2017 WL 506250, at *4 (D. Mass. Feb. 7,
2017).  Accordingly, Count V is subject to summary judgment.

VII.  <u>IIED Claim (Count VI)</u>

Count VI alleges an IIED claim against Barrows, Trotman,
Dorgan, Allen, and Sullivan based on the May 29, 2014 incident.
Defendants move for summary judgment on the basis that their
"conduct was neither extreme nor outrageous."  (Docket Entry #
243, pp. 18-19).  Plaintiff argues that Barrows, Trotman,
Dorgan, Allen, and Sullivan's conduct meets this standard as it
was intentional and violated his constitutional rights.  (Docket
Entry # 252, pp. 81-91).  Plaintiff also relies on the conduct

116

preceding the May 29th incident to avoid summary judgment.
(Docket Entry # 252, pp. 81-91).

An IIED claim requires a plaintiff "'to show (1) that [the
defendant] intended, knew, or should have known that his conduct
would cause emotional distress; (2) that the conduct was extreme
and outrageous; (3) that the conduct caused emotional distress;
and (4) that the emotional distress was severe.'"  Galvin v.
U.S. Bank, N.A., 852 F.3d 146, 161 (1st Cir. 2017) (quoting
Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014)).  "Extreme
and outrageous conduct is behavior that is 'so outrageous in
character, and so extreme in degree, as to go beyond all
possible bounds of decency, and to be regarded as atrocious, and
utterly intolerable in a civilized community.'"  Young v. Wells
Fargo Bank, N.A., 717 F.3d 224, 240 (1st Cir. 2013) (quoting
Foley v. Polaroid Corp., 508 N.E.2d 72, 82 (Mass. 1987)).  The
standard is "'very high'" and is not met "even if the defendant
acted 'with an intent which is tortious or even criminal,' with
'malice,' or with 'a degree of aggravation which would entitle
the plaintiff to punitive damages for another tort.'"  Galvin,
852 F.3d at 161 (internal citations omitted); see, e.g., Sneade
v. Rojas, Civil Action No. 11-40061-TSH, 2014 WL 949635, at *8
(D. Mass. Mar. 10, 2014) (defendant officer's conduct of
shooting plaintiffs' pet, 85 pound mixed-breed dog, that ran out
of kitchen and barked at officer but then remained sitting,

117

lacked "requisite level of outrageousness and atrocity"); cf. Chao v. Ballista, 806 F. Supp. 2d 358, 380 (D. Mass. 2011) (denying motion for new trial on IIED claim and finding that "demanding fellatio in twenty-three separate places with" plaintiff, an inmate, "in a correctional institution—was extreme and outrageous").

Here, no reasonable factfinder could conclude that the conduct on May 29 or prior thereto in April and May 2014 was extreme and outrageous.  On May 29, Trotman, Dorgan, and Sullivan acted in accordance with Policy S403 and Policy S422. Allen focused on completing the reports and by and large did not take part in the inventory of plaintiff's property.  (Docket Entry # 244-4, ¶ 5).  Barrows was not present during the inventory of plaintiff's property or handle his property. (Docket Entry # 244-2, ¶ 3).  In April and May, neither Sullivan nor Allen engaged in extreme and outrageous conduct.  The disciplinary reports were well founded and any yelling, slamming of cell doors, and ordering plaintiff to "lock in," may be annoying and aggravating but it does not go beyond all possible bounds of decency.  See Hayes v. Mirick, 378 F. Supp. 3d 109, 117 (D. Mass. 2019) ("mere insults, indignities, threats, annoyance, petty oppressions, or other trivialities" do not constitute extreme and outrageous conduct) (internal citations

omitted).   The IIED claim is therefore subject to summary
judgment.

VIII.   Eighth Amendment and Substantive Due Process Claims
(Count IX)

Count IX alleges Eighth Amendment violations against
Trotman, Dorgan, Barrows, Allen, and Sullivan grounded upon the
disposal of plaintiff's legal materials and includes a
Fourteenth Amendment substantive due process claim.[64]  (Docket
Entry # 100, ¶¶ 96-101) (Docket Entry # 185).   The count is
premised upon defendants' disposal of all of plaintiff's legal
materials, which impaired his defenses in the three, pending
criminal cases and caused him "pain and suffering."  (Docket
Entry # 100, ¶¶ 96-101).   Under the "'totality of the
circumstances,'" the destruction purportedly resulted in
plaintiff pleading guilty and receiving "3½ to 5½ years in state
prison."  (Docket Entry # 100, ¶ 99).

The foregoing defendants seek summary judgment on the
Eighth Amendment claim because they did not act with deliberate
indifference.[65]  (Docket Entry # 243, p. 21).   They point out

---

[64]   See footnote 11.
[65]   Defendants do not move for summary judgment on the
substantive due process claim in Count IX.   (Docket Entry # 242,
pp. 1-2) (describing Count IX as "Eighth Amendment violations");
(Docket Entry # 243, p. 2) (same);  (Docket Entry # 243, p. 5)
(same);  (Docket Entry # 243, p. 21) (addressing only Eighth
Amendment claim regarding Count IX).

that they did not know plaintiff was pro se in the three pending criminal cases.  Alternatively, they argue there is no showing that they destroyed any of his legal materials.  (Docket Entry # 243, p. 21).

Plaintiff does not address Count IX and defendants' arguments to dismiss the count in his 93-page opposition memorandum (Docket Entry # 252) and therefore waives any argument to the contrary.  See Eldridge v. Gordon Bros. Grp., L.L.C., 863 F.3d 66, 84 (1st Cir. 2017) (rejecting plaintiff's argument that district judge should have exercised his discretion and addressed the merits of plaintiff's waived summary judgment argument in plaintiff's opposition rather than rely on waiver).  The fact that this court addresses the merits of defendants' arguments as an alternative means to allow summary judgment on Count IX is not intended to avoid this waiver, which this court reserves as a basis to allow summary judgment on Count IX.  See Negron-Almeda v. Santiago, 528 F.3d 15, 26 (1st Cir. 2008) (stating "rule" that if party belatedly raises argument "in the district court but that court, *without reservation*, elects to decide it on the merits, the argument is deemed preserved for later appellate review") (emphasis added).

"[A] prison official violates an inmate's Eighth Amendment right against cruel and unusual punishment 'based on a failure to prevent harm' to the inmate only under two circumstances:

'the inmate must show that he is incarcerated under conditions
posing a substantial risk of serious harm,' and the prison
official must have acted, or failed to act, with 'deliberate
indifference to inmate health or safety.'"  Lakin v. Barnhart,
758 F.3d 66, 70 (1st Cir. 2014) (internal citation omitted).
"Deliberate indifference, in this sense, is a mental state akin
to criminal recklessness."  Surprenant v. Rivas, 424 F.3d 5, 19
(1st Cir. 2005) (citation omitted).  A prison official acts
"with deliberate indifference to inmate health," including
mental health,[66] or to inmate "safety only if the official 'knows
of and disregards an excessive risk to inmate health or safety;
the official must both be aware of facts from which the
inference could be drawn that a substantial risk of serious harm
exists, and he must also draw the inference.'"  Calderón-Ortiz
v. LaBoy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002) (quoting
Farmer v. Brennan, 511 U.S. 825, 837 (1994)); accord
Madison v. Cruz, 359 F. Supp. 3d 135, 144 (D. Mass. 2019)
(applying two-prong deliberate inference standard in Farmer, 511
U.S. at 837, to Eighth Amendment failure to protect inmate's
safety claim); Madison, 359 F. Supp. 3d at 144 ("'prison
official may show that even if the risks were obvious to others,

---

[66]  See Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991)
("eighth amendment also protects against deliberate indifference
to an inmate's serious mental health and safety needs").

it was not obvious to them'") (citation omitted); see also Leite
v. Bergeron, 911 F.3d 47, 53-54 (1st Cir. 2018) (affirming lower
court's summary judgment under subjective prong based on lack of
deliberate indifference and noting "no evidence that Bergeron
had any suspicion that an inmate needed medical attention")
(also quoting Farmer, 511 U.S. at 837).  Knowledge is required
and "an official's failure to alleviate a significant risk that
he should have perceived but did not, while no cause for
commendation, cannot under our cases be condemned as the
infliction of punishment."  Farmer, 511 U.S. at 838.

Here, there is insufficient evidence to allow a factfinder
to find that the above defendants knew about plaintiff's three,
pending criminal cases or that plaintiff was pro se in these
cases.  Trotman, Allen, Sullivan, Dorgan, and Barrows all state
by affidavit that they did not know plaintiff had pending
criminal matters or that he was pro se as of May 29, 2014.
(Docket Entry # 244-2, ¶ 4) (Docket Entry # 244-3, ¶ 12) (Docket
Entry # 244-4, ¶ 6) (Docket Entry # 244-5, ¶ 7) (Docket Entry #
244-7, ¶ 8).  With the above defendants having asserted the
absence of evidence of knowledge, it was incumbent upon
plaintiff to identify matters of evidentiary quality to the
contrary, which he fails to do.

Defendants' additional argument that there is no showing
that they discarded or destroyed his legal materials is also

well taken thus providing an alternative basis to allow summary judgment.  As previously discussed, a reasonable factfinder could not conclude that one or more defendants discarded the W.B. Mason box of legal papers or the bag of manila envelopes with legal paperwork.  Rather, Misci delivered the W.B. Mason box of legal materials to plaintiff in late June 2014; and on July 22, 2014, plaintiff "was notified that his legal papers were secured in the law library."  (Docket Entry # 244-22, p. 2, ¶ 9) (Docket Entry # 252-1, p. 37).  The Eighth Amendment claim Count IX, whether viewed as deliberate indifference to plaintiff's safety or to plaintiff's mental health, is subject to summary judgment.[67]

CONCLUSION

Defendants' motion for summary judgment (Docket Entry # 242) is **ALLOWED.**  The substantive due process claim in Count IX is the only remaining claim in this action.[68]  The deadline to file a dispositive motion (Docket Entry # 236) has passed, and there shall be no extensions.  This court will conduct a status conference on February 1, 2022, at 2:15 p.m.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[67]  In light of the allowance of summary judgment, it is not necessary to address defendants' qualified immunity argument.
[68]  See footnotes 11 and 65.